Paul Faugno
Faugno & Associates, LLC
125 State Street
Suite 101
Hackensack, NJ 07601
201-342-1969
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____

MARK VAN                                      : Civil Action No.05-5595 (JLL)
                                              :
Plaintiff(s),                                 :
                                              :
-vs-                                          :
                                              :
BOROUGH OF NORTH                              :
HALEDON, et al                                :
                                              :
Defendant(s).                                 :
_____                :

_____

**STATEMENT OF UNDISPUTED MATERIAL FACTS**
_____

1.      Plaintiff, Mark Van, resigned from the Borough of North Haledon Police Department in December of 2006, in regard to issues unrelated to the subject matter of this present litigation.

2.      When Mark Van resigned from the Borough of North Haledon Police Department, the resignation included an agreement on the part of Borough of North Haledon that future communications regarding Mark Van to prospective employer in the future would be limited to "patrolman Mark Van served as a patrolman from April 28, 1999 to November 3, 2000 where he submitted his voluntary resignation effective November 3, 2000".  See attached exhibit 1.

3.      From November 3, 2000 until being hired by the Harrington Park Police Department on November 8, 2004, Mr. Van was unable to procure a position as a police officer.

4.      When Mr. Van was employed with the Borough of North Haledon, defendant, Mark Rowe, was also a police officer at the same time frame.  While they were both employed by North Haledon up until 2000 there were some antagonisim that existed between Mark Rowe and Mark Van.  See attached Exhibit 2 deposition testimony of Mark Rowe.

5.      Prior to Mr. Van's employment with Harrington Park Police Department, he had a run in with Mark Rowe.  In particular, in 2002 while Mark Van was going to a fire call as a volunteer for the fire department, Mark Rowe gave him a speeding ticket despite the fact that he was going to a fire.  See attached Exhibit 3 – tickets issued to Mark Van and Exhibit 4 – deposition testimony of Mark Rowe)

6.      When Mr. Van was hired by Harrington Park, there was another police officer employed by Harrington Park by the name of Pete Faye.  Mr. Faye was friendly with defendant, David Parenta.  See attached Exhibit 5 – deposition testimony of David Parenta.

7.      Pete Faye was also an acquaintance of defendant herein John Centrillo as he had previously worked with the Dumont Police Department where Centrillo is employed.  See attached Exhibit 6 – deposition testimony of Pete Faye.

8.      Shortly after Van's employment with Harrington Park within three weeks, Faye contacted defendant Dave Parenta by phone and advised him that Mark Van was working for Harrington Park Police Department.  See Exhibit 7 deposition testimony of Pete Faye.

9.      The day after Parenta learned that Van was working for Harrington Park he advised Chief Ferrante of the same.  See Exhibit 8 – deposition testimony of Parenta.

10. In regard to these conversations, defendant Mark Rowe also became aware that Mark Van was working in Harrington Park shortly after his employ there. See Exhibit 9 – deposition testimony of Mark Rowe.

11. This came in contradiction to testimony of John Centrillo, who testified that when he allegedly spoke to Mark Rowe to report the incident regarding the displaying of the badge in New York City, Mark Rowe did not know that Van was working in Harrington Park. See Exhibit 10 – deposition testimony of Centrillo.

12. At this point in time with defendants, Ferrante, Rowe, Parrenta and Centrillo all knowing that Mark Van was employed with Harrington Park, the following events occurred.

  A. On November 24, 2004 Mr. Mark Van was on duty in uniform and exiting the Harrington Park Police Department in the middle of the afternoon. At that time he was confronted by two uniformed North Haledon Police Officers, defendant, Todd Darby and David Parenta. He was advised that they were conducting an investigation into a report that he had utilized a North Haledon police badge to extricate himself from an altercation outside of a New York City night club two nights prior. See exhibit 11 deposition testimony of Mark Van.

  B. This case as a shock to Mark Van as he adamantly denied being in New York committing any acts as alleged. Mark Van had turned in all his badges when he resigned from the Borough of North Haledon. See Exhibit 12.

  C. During this conversation Mark Van has testified and tape recordings reflect that if Mark Van did not turn over the badge, further actions would be taken including contacting Mr. Van's then chief Moppert. See Exhibit 13.

  D. Shortly after this confrontation, on December 10 , 2004 the Mayor of Harrington Park, Paul Hoeschler received an anonymous letter containing various disparaging information regarding Mark Van. See Exhibit 14.

  E. Upon receipt of this anonymous letter, Chief Moppert determined that an investigation should be conducted into Mark Van. See Exhibit 15. As part of this investigation he spoke with Mark Van, at which time Mark Van determined that because of the claimed investigation by the Borough of North Haledon Police Department on November 24, he was obligated to disclose to his chief that he was under investigation which he did. See Exhibit 16.

  F. Thereafter, an internal affairs investigation was conducted which is contained in Exhibit 15 which ultimately determined that there was no records of any incident occurring outside of the China Club in New York City. On November 22, 2004 defendant, Joseph Ferrante, testified that he received information from the defendant David Parenta that Parenta was advised by Mark Rowe that he

had a report that Mark Van or someone using Mark Van's identification to get out of an altercation. This information came only a couple of days after defendant Chief Ferrante learned along with defendant Parenta and Rowe that Mark Van was working in Harrington Park. See Exhibit 17 deposition testimony of Joseph Ferrante.

  G. Defendant Joseph Ferrante testified that after learning this information, he called Mark Rowe into his office, at which time Mark Rowe advised that he had received information from another police officer who had in turn had received information from a New York City Police Officer. Despite being requested of this information, defendant, Mark Rowe, while on duty refused to disclose this information. See Exhibit 18 deposition testimony of Ferrante.

  H. Defendant Ferrante testified that based upon this information, he commenced an investigation and requested that defendants Darby and Parenta go to Harrington Park. Prior to doing this, Det. Darby and Parenta allegedly went to the Dumont Police Station to investigate the information received from Det. John Centrillo. Defendant, Parenta has claimed that when he interviewed John Centrillo while on duty at the Dumont Police Station, he asked John Centrillo to disclose the source of his information but John Centrillo refused. Exhibit 19 Borough of North Haledon Investigative Report.

  I. The Chief of the Harrington Park Police Department as part of the internal affairs investigation contacted Chief Ferrante to make an inquiry of him as to how all this happened without any notice to him. In this conversation Ferrante told him that he had received a phone call from a friend from New York City Police Department who provided information that Mark Van improperly used North Haledon identification. Further, according to Moppert Chief Ferrante told him that they should meet sometime and he would tell him about Mark Van. See attached Exhibit 20 Affidavit of Moppert.

  J. Through an accumulation of events, including the investigation by the Borough of North Haledon and the allegations of him being involved in an incident in New York City and the anonymous letter, Mark Van was terminated as a probationary police officer from Harrington Park. See Exhibit 21 deposition testimony of Moppert.

13. Because of the events set forth in the previous paragraphs, on December 9, 2004 Mark Van, through his counsel sent a correspondence to the Borough of North Haledon Police Department, requesting that they cease and desist from any further harassing actions against Mr. Van. See Exhibit 22.

14. As of the writing of this letter, despite the fact that allegations were made that Mark Van had committed an offense and an investigation had been conducted, the Borough of North Haledon Police Department created no written memorialization of any of the events. The one and only investigative report in

this matter was drafted by David Parenta on December 16, 2004 seven (7) days after Van's counsel forwarded correspondence to North Haledon.  See Exhibit 23 deposition testimony of Parenta.

15.    One day following the preparation of the investigative report by David Parenta, defendant Ferrante forwarded correspondence dated December 17, 2004.  See Exhibit 24.  That letter refers to "the officers from other jurisdictions who gave the information to North Haledon claimed that they alerted our department on the improper conduct by one of our officers as a courtesy, and consequently they refused to send a written report confirming the incident."  This letter clearly hides the identity of defendant, John Centrillo.

16.    At the time the defendant Ferrante, Parenta, Darby, and North Haledon provided Rule 26 Disclosures they continued to fail to disclose the name of John Centrillo, despite having knowledge of the same.  The name John Centrillo was never disclosed until a response to a Notice to produce documents and Answers to Interrogatories in November of 2006 which is the first time the North Haledon defendants provided the name John Centrillo.

17.    Thereafter, it was not until the deposition of John Centrillo on June 19, 2007, that the alleged source of the Mark Van incident in New York City incident was disclosed.  See Exhibit 25 deposition testimony of John Centrillo.

18.    John Centrillo testified that James Linari, a New York City police officer, told him that Mark Van had been involved in a fight in front of a night club in New York and was arrested and displayed a North Haledon badge at which time he was unarrested.  See Exhibit 26 deposition testimony of John Centrillo.

19.    Centrillo further testified that Linari told him that he did not want to have his name disclosed because he unarrested someone and he could get in trouble for that, and that he lives in New Jersey and works in New York City.  See Exhibit 27 deposition testimony of John Centrillo.

20.    In complete contrast to the testimony of Centrillo was the testimony of James Linari.  Mr. Linari testified to the following pertinent facts.

    A.    Linari on November 24, 2004 at the time of the alleged incident with Mark Van lived in New York City, in Nanuet, NY.   See Exhibit (28) deposition testimony of James Linari.

    B.    In November 2004 Linari was employed by the New York City Middle North Precinct.  See Exhibit 29 deposition testimony of James Linari.

    C.    Officer Linari knows no one from the North Haledon Police Department nor does he know where North Haledon is located.  See Exhibit 30 deposition testimony of James Linari.

    D.    Nor does he know any member of the Harrington Park Police Department.  See Exhibit 31 deposition testimony of James Linari.

    E.    He knows defendant John Centrillo, yet only from Centrillo being a member at the gym where he works out.

    F.    Linari testified that at one occasion in approximately in November 2004 he had a conversation with John Centrillo and the name of Mark Van came up.  During that conversation Linari denied ever telling Centrillo that he had any confrontation outside of China Club with a person who identified himself as Mark Van.  See Exhibit 32 deposition testimony of James Linari.

    G.    Linari further testified that at no time in his career did anyone ever show him a badge identifying him as Mark Van or having an encounter with someone by the name of Mark Van or wanting to identify them as Mark Van outside of China Club in New York City. See Exhibit 33 deposition testimony of James Linari.

    H.    He further testified that at no time did he ever tell Officer Centrillo that he arrested and then unarrested a person who identified them as Mark Van outside the China Club. See Exhibit 34 deposition testimony of James Linari.

    I.    He further testified that he never told Centrillo that he wanted him to contact the Borough of North Haledon to advise them of any issue.  See Exhibit 34 deposition testimony of James Linari.

    J.    He further never told Centrillo that he tried to call the Borough of North Haledon and tell them what happened outside of the China Club.  See Exhibit 35 deposition testimony of James Linari.

    K.    Nor did he ever call the Borough of North Haledon nor did he know where North Haledon was located.   See Exhibit 35 deposition testimony of James Linari.

    L.    He further testified that he never told Centrillo that he didn't want to get in trouble because he was supposed to live in New York.  See Exhibit 35 deposition testimony of James Linari.

    M.    The fact that he lived in New York was documented by a lease agreement.  See attached Exhibit 36.

    N.    Linari further testified that several days after his initial conversation with Centrillo, Centrillo acknowledged that he advised the North Haledon Police

Department of the events which Linari allegedly told him.   Linari told him that that never happened and that he needed to take care of it and straighten it out.  See Exhibit 37 deposition testimony of James Linari.

21.   With the following background, defendant Chief Ferrante of the North Haledon Police Department, recognized that the allegation that Mark Van was improperly using a police badge constituted a criminal act.  See attached Exhibit 38 - deposition testimony of Chief Ferrante.   He also testified that he wanted reports from all parties who reported information regarding Mark Van so he can begin a full investigation, he never received these reports.   He states therein "I know I am beginning investigation on hearsay".  Ferrante denied ever hearing the name John Centrillo until the days before his deposition was conducted on March 21, 2007. See attached Exhibit 39, 40 deposition of Chief Ferrante.

22.   Ferrante testified that the information received was a courtesy which is common for police departments.  See Exhibit 41.

23.   The plaintiff Mark Van retained a police misconduct expert in regard to this matter who rendered a report and testified at depositions as to the following position and issues.

1.   Dr. Kirkham testified that he is a full time assistant professor of criminology at Florida State University and that between 1971-1973 took a leave to go the police academy and then worked in Jacksonville, Florida Police Department for 6 months as a patrol officer.  See Exhibit 42 deposition testimony of Dr. Kirkham.

2.   Dr. Kirkham also testified that he has been retained as a police expert in some 1,500 cases.  See Exhibit 43 deposition testimony of Dr. Kirkham.

3.   While Dr. Kirkham testified that he did not have any specific background as a police investigator, he testified that he is thoroughly familiar with the professional standards that exist and that have existed for many years throughout the United States regarding police investigative procedures including internal affairs matters".  See Exhibit 44 deposition testimony of Dr. Kirkham. Dr. Kirkham further testified that he worked for law enforcement agencies regarding criminal investigations with the office of the Sheriff of Jacksonville, Florida, Tallahassee Police Department, Leon County Sheriff's Department.   See Exhibit 44 deposition testimony of Dr. Kirkham.

4.   Dr. Kirkham also testified that in his past, he has been given a grant by the United States Department of Justice to work as an undercover officer in Federal Strike Force in Fort Lauderdale.  See Exhibit 45 deposition testimony of Dr. Kirkham.  Dr. Kirkham also testified that he has published videotapes for police officers, titled "Police Authority and Formal Discretion", involving the

proper use and the exercise of authority, which was developed pursuant to the grant from the United States Department of Justice.    See Exhibit 46 deposition testimony of Dr. Kirkham

     5.    Dr. Kirkham testified that the actions of the defendants herein constituted extremely serious violations and egregeous, outrageous and beyond the pale of anything remotely acceptable in the field of law enforcement.  Dr. Kirkham when questioned as to basis for the same stated the following.

> "based upon my familiarity and I will be glad to give you examples off the top of my head my familiarity with the extensive body of publications, books, monograms, articles or proper investigative procedures, police investigative procedures involving specifically police personnel who has been allegedly have been involved in some form of misconduct.  The backdrop of my familiarity with the relevant body of professional literature that is utilized in my experience throughout the United States in law enforcement agencies, federal state and local".  See Exhibit 47 deposition testimony of Dr. Kirkham

     6.    Dr. Kirkham at the time of deposition also provided specific literature and publications with which he was familiar with in supporting his opinion.  See Exhibit 48 deposition testimony of Dr. Kirkham.

     7.    When Dr. Kirkham was questioned regarding whether the proper investigative technique was to send police officers to Mark Van's place of employment, he provided specific reasons for his opinion that this was an improper investigative procedure.  See Exhibit 49 deposition testimony of Dr. Kirkham.

     8.    Dr. Kirkham was questioned as to further improprieties in the manner in which the defendants herein conducted the investigation.  He simply gave testimony as to how an investigation against another police officer should be opened and conducted.  He gave specifics as to what should have been done and not done. See Exhibit 50 deposition testimony of Dr. Kirkham

     9.    Dr. Kirkham in responding to questions as to whether it would have been acceptable for Chief Ferrante to send two officers to talk to Mark Van about the allegation in the nightclub, he gave specific examples  how the investigations should have been conducted, if it was a valid investigation.  See Exhibit 51 deposition testimony of Dr. Kirkham.