**EXHIBIT 11**

1   only.  So no, I didn't call anybody.
2           Q.    Then you went to Dunkin' Donuts?
3           A.    Correct.
4           Q.    And you had a conversation?
5           A.    Yeah.
6           Q.    Tell me about that conversation.
7           A.    We met in front of the Dunkin' Donuts
8   outside, at which time Detective Parenta said to me
9   that Chief Ferrante was unaware of the fact that I
10  had been employed by Harrington Park.  He -- it was
11  news to him, sort of.  And that he had sent him there
12  to conduct an investigation regarding the incident
13  that took place in the China Club.  They claimed to
14  me at that time that I was in the China Club in New
15  York City, I was involved in some type of, I don't
16  want to use the term "scuffle," some type of
17  altercation or scuffle that involved assaults where I
18  used my badge, a North Haledon police badge to
19  exculpate myself and to kind of get away from the
20  incident.  They claimed that at that time that Chief
21  Ferrante had received a report of that, to the best
22  of my knowledge and that's what they were
    investigating.  And if I had the North Haledon badge
    in my possession I was going to turn it over or be
    prosecuted.

| | | |
|---|---|---|
| 1 | Q. | They said you would be prosecuted? |
| 2 | A. | That's what I remember them saying. |
| 3 | Q. | Back to the parking lot. |
| 4 | | What was their demeanor?  You said they |
| 5 | were going to make your life miserable and things | |
| 6 | like that.  What was their demeanor to you? | |
| 7 | A. | An aggressive posture.  One that I |
| 8 | recognize as a police officer trying to investigate | |
| 9 | and find out what he wants to know. | |
| 10 | Q. | So for two police officers conducting an |
| 11 | investigation did you find anything out of the | |
| 12 | ordinary out of their demeanor? | |
| 13 | A. | Yes, I did. |
| 14 | Q. | What was out of the ordinary? |
| 15 | A. | I thought it was overly aggressive for |
| 16 | and adversarial for one police officer that I know, | |
| 17 | another police officer that I vaguely know, to talk | |
| 18 | to another police officer in the manner in which we | |
| 19 | were communicating.  It would be like speaking to | |
| 20 | another attorney noncordially and not respectfully. | |
| 21 | Q. | But did I understand your testimony just |
| 22 | before that sometimes cops, when conducting an | |
| 23 | investigation, are aggressive?  Did I understand you | |
| 24 | correctly? | |
| | A. | That's a fair statement. |

1  Q.  So you feel they were overly aggressive?
2  A.  I feel they were overly aggressive and
3  harassive to me.
4  Q.  It's okay for a cop conducting an
5  investigation to be aggressive?
6  A.  Aggressive within the confines of the
7  law and mutual respect to other humans, yes.
8  Q.  But aggressive. Right?
9  A.  Aggressive with a very narrow
10  definition.
11  Q.  Okay. When you went to Dunkin' Donuts
12  what was their demeanor?
13  A.  Their demeanor was similar initially.
14  And after I had some things to say to them, you know,
15  we went up and we went down. It escalated and
16  de-escalated.
17  Q.  They were aggressive at Dunkin' Donuts
18  and then they weren't aggressive and then they were?
19  A.  In the confines of a conversation. We
20  escalated and we de-escalated.
21  Q.  Would you describe it as kind of just a
22  conversation between three cops?
23  A.  No. I don't think I would take it as
24  that. I was -- in that conversation things were
25  intimated to me, things were expressed to me, things

```
 1  were said to me that I didn't like.
 2       Q.    What didn't you like?
 3       A.    I didn't like the fact that they were
 4  accusing me of doing something that I hadn't done,
 5  that there's a point -- I mean, I don't have the
 6  reference of the entire conversation at the tip of my
 7  tongue. It's how many years ago now. But things
 8  that were said to me that, you know, would reflect
 9  negatively upon me in my career in Harrington Park,
10  that would be detrimental to my career. Threats that
11  I am being accused of something that I didn't do. As
12  a police officer I'm sure you're aware that it makes
13  it even worse. I didn't like their attitude, the way
14  they spoke and treated me. In my opinion they were
15  very threatening to me and my future.
16       Q.    When you asked them to go talk somewhere
17  else, what was their response?
18       A.    They agreed.
19       Q.    So what was the threat at that point?
20       A.    The threat to me? I didn't know what I
    was getting into at that point. The unknown is
    always, I think fair to say, is a threat.
         Q.    They didn't call up your chief, though,
    to the best of your knowledge, did they?
         A.    I'm unaware if they spoke to my chief at
```

**EXHIBIT 12**

## *Borough of North Haledon*

THE FRIENDLY COMMUNITY
MUNICIPAL BUILDING
103 OVERLOOK AVENUE
NORTH HALEDON, N.J. 07508

POLICE DEPARTMENT
TELEPHONE 973 423-1111
FAX 973 304-0978

Joseph Ferrante
Acting Chief of Police

Phone: 973 423-1401
Pager: 973 654-0654

PROPERTY RECEIPT

Date Nov 3, 2000

I, Det. Alan Swartz, hereby acknowledge receipt of the property listed below, on behalf of the North Haledon Police Department, FROM MARK VAN.

1- H&K USP COMPACT 40 CAL    SER# 26-032064
1- GRAY PLASTIC CASE W/LOCK
3 CLIPS (H&K) WITH 12 ROUNDS EACH + 1
1- MOTOROLA WALKIE-TALKIE HT-1250   SER# 749TYY5658
1- CHARGER HTN9000A
1- HAT BADGE #717
1- POLICE ID IN BLACK LEATHER
1- PATROLMAN'S BADGE
1- BLACK HOLSTER
5- LONG SLEEVE SHIRTS (POLICE)
4- SHORT SLEEVE SHIRTS (POLICE)
1- HOLDER (LEATHER) RADIO
2- SHOTGUN LOCK KEYS
1- PATROLMAN'S FRENCH BLUE HAT
9- POLICE PANTS
2- NH POLICE DEPT. PATCHES
1- MOTOROLA RADIO MANUAL
1- BLACK LEATHER BELT.

Received by: [signature]
[signature]

**EXHIBIT 13**

Case 2:05-cv-05595-JLL-CCC   Document 60-7   Filed 01/12/2009   Page 9 of 14
Case 2:05-cv-05595-JLL-CCC   Document 46-26   Filed 12/05/2008   Page 6 of 23

Page 5

```
 1   down and you had it, let's go get it and that's the end of
 2   it.
 3           MARK VAN:  Todd, you live five houses around the
 4   corner from me.
 5           TODD DOUGHERTY:  To be honest with you, and I
 6   haven't seen you.  You live there, I had no idea.
 7           MARK VAN:  I've never had a problem with you.  My
 8   problem with Ferrante (PHONETIC) is different, alright.
 9   And the bottom line is why would I do something like that?
10   Why?
11           TODD DOUGHERTY:  I didn't even know that you still
12   lived there, I'm not going to lie, I didn't.  When's the
13   last time I've seen you?  I know I live five houses from
14   here.
15           MARK VAN:  (INAUDIBLE) badge, you know what I'm
16   saying?
17           UNKNOWN SPEAKER:  No, I know.  I didn't know you
18   lived there, I really didn't, honestly.
19           UNKNOWN SPEAKER:  We didn't know you were working
20   here and when the chief caught wind of this situation
21   today, he felt robbed and he didn't know about your
22   employment here because nobody told him.  So, I think he's
23   concerned.
24           UNKNOWN SPEAKER:  I think uh -- he doesn't.
25           UNKNOWN SPEAKER:  If we don't come back with some
```

Case 2:05-cv-05595-JLL-CCC   Document 60-7   Filed 01/12/2009   Page 10 of 14
Case 2:05-cv-05595-JLL-CCC   Document 46-26   Filed 12/05/2008   Page 7 of 23

Page 6

1  sort of (INAUDIBLE) here tonight I'm telling you right now
2  the chief is going to call your chief.
3  　　　　MARK VAN: You know what -- well, first of all, why
4  would anybody call him in the first place? Alright.
5  Second of all, who is he to be tracking me and you don't
6  have to give me any ulitimatums, alright. If you guys
7  have something to charge me with then you can deal with my
8  lawyer.
9  　　　　UNKNOWN SPEAKER: No. We're not looking to do that
10 Mark.
11 　　　　MARK VAN: You don't like it, because you don't
12 have anything to charge me with, bottom line. If there
13 was, I think you could tell me where it came from.
14 　　　　UNKNOWN SPEAKER: We got a call from New York City.
15 I don't really want to go over to New York City, I told
16 you exactly what club it was.
17 　　　　MARK VAN: Well, how does my name come out of the
18 wash? That's what I don't understand. I --
19 　　　　UNKNOWN SPEAKER: They said Mark Van, they said who
20 the name was.
21 　　　　UNKNOWN SPEAKER: It's possible someone else has
22 your ID, I'm not saying that that's not the case.
23 　　　　MARK VAN: I don't have any ID, I don't have any
24 North Haledon badge. If there was some reason for me to
25 show a badge, which I wouldn't do, I would show the badge

EXHIBIT 14

## MARK VANSPLINTER?   MARK L. VAN?

| Employment | Position | Status |
|---|---|---|
| Riverside Square Mall | Security guard | Fired |
| Florida | ? | ? |
| Middlesex County Campus Police | Officer | ? |
| Haworth Police Department | Dispatcher | Fired |
| Paramus Police Department | Dispatcher | Fired |
| Hackensack Medical Center | Paramedic | Fired |
| Morris County Police Academy | ? | ? |
| Glen Ridge | ? | ? |
| Pasaic County Police Academy | Instructor | ? |
| North Haledon Police Department | Police Officer | Resigned pending charges. |
| Haledon Police Department | Special Officer | ? |

Thank you for using NewsLibrary

# The Record (New Jersey)

## POLICE LIEUTENANT RESIGNS UNDER FIRE

## NORTH HALEDON VETERAN FACED DISCIPLINARY CHARGES

October 26, 2000
Section: NEWS
Edition: Two Star P
Page: L1
The Record JUSTO BAUTISTA, Staff Writer

A police lieutenant facing disciplinary charges resigned Wednesday, becoming the fourth officer in the 16-member department who has either run afoul of department procedures or faced a criminal investigation this year.

Lt. Guy Tarsitano, a 19-year veteran, turned in his badge, weapons, and uniforms. He also will resign from the borough's Office of Emergency Management, Board of Recreation, and Fire Department.

Under an "irrevocable" resignation agreement, Tarsitano also will be prohibited from serving as a coach in any North Haledon sports team and will be barred from serving as an appointee on any borough board or committee. The agreement passed in a 5-1 vote by the Borough Council after a closed-door meeting Wednesday night.

Tarsitano will be on terminal leave until Feb. 6, 2001, when the resignation becomes effective.

Council members said the agreement was in the "public interest," but none would comment on the disciplinary charges that were pending against Tarsitano.

The agreement precludes them from discussing the deal, they said. The charges, brought by acting Police Chief Joseph Ferrante, have been withdrawn.

Councilman Anthony J. DeNova was the lone dissenter. He said Tarsitano's resignation was necessary, but he was against providing terminal leave pay to the lieutenant.

"Compensation should end Oct. 25," said DeNova.

Robert LaSalle of West Paterson, Tarsitano's lawyer, declined to comment on the resignation, citing the agreement. Borough Attorney James Segreto also

DEFENDANTS 443

declined to comment, giving the same reason.

In July, Tarsitano was credited with saving the life of an elderly man who had suffered a stroke and crashed his car on Ballentine Drive, smashing his head against the windshield. Tarsitano removed the man's dentures and steadied his head, allowing him to breathe again.

In January, another 19-year police veteran, Fordyce Hubbard, resigned after pleading guilty to stealing $3,200 from a Paterson bait and tackle shop where he moonlighted.

In February, Detective John Nicosia, 28, considered a rising star in the department, and a Ferrante prot'eg'e, was charged with falsely reporting that his Jeep Cherokee had been stolen, to collect insurance money.

Nicosia was among 89 people - caught in an FBI sting - who allegedly participated in a scam involving $3 million worth of vehicles.

Nicosia has been suspended without pay, pending the outcome of the case.

In September, Officer **Mark Van** was brought up on departmental charges, alleging that he falsified a police report after a stolen vehicle pursuit.

Staff Writer Justo Bautista's e-mail address is bautista(at)bergen.com

All content © 2000- The Record (New Jersey) and may not be republished without permission.

All archives are stored on a SAVE (tm) newspaper library system from MediaStream Inc., a Knight-Ridder Inc. company.

DEFENDANTS 444