EXHIBIT 15



# INTERNAL AFFAIRS INVESTIGATION
## Lt. Albert Maalouf

December 13, 2004

On December 10, 2004 at approximately 14:50 hours, Chief Moppert informed me that an anonymous letter was received by Mayor Paul Hoelscher alleging impropriety by P.O. Mark Van. The letter alleged that P.O. Van had been fired by several past employers but did not give specifics. The letter also alleged that P.O. Van had been administratively charged by his former employer, the North Haledon Police Department, for filing a false police report.

Chief Moppert instructed me to conduct an investigation into these allegations. At approximately 15:40 on December 10, 2004, I spoke with P.O. Van and was furnished with the following information: P.O. Van stated that charges had been filed against him in North Haledon, where he was employed as a police officer, for filing a false police report in 2000, exact date unknown. The allegation stemmed from an arrest Officer Van was involved in. Officer Van was subsequently exonerated and received a letter from the North Haledon Borough Attorney stating that the borough would not file disciplinary charges. In fact charges had already been filed and a hearing was held. It was determined by the borough that the allegation was untenable, and further proceedings would have been ill advised. Please refer to Chief Moppert's file for corroborating documents.

P.O. Van further stated that on November 24, 2004 at approximately 15:40 hours, upon returning to police headquarters at the end of his shift, he observed a North Haledon Police unit (marked) in our police parking lot. Officer Van approached two officers (Names to be supplied at a later date) in the patrol vehicle to ascertain their business. P.O. Van recounted that a North Haledon Police lieutenant informed him that their chief of police instructed them to conduct an investigation regarding the abuse of authority and improper use of police identification by Officer Van. P.O. Van was informed that a report had been received implicating him in an altercation, which occurred at the China Club on November 22, 2004, at 268 W. 47 Street, New York, NY. In addition, P.O. Van was reported to have produced a North Haledon Police identification in order to avert potential consequences from the altercation. P.O. Van accompanied the North Haledon Officers to a Dunkin Doughnuts and taped their conversation in order to establish his innocence. A copy of the tape was provided to Chief Moppert.

P.O. Van denied any truth to these allegations, instead alleging a smear campaign by certain members of the North Haledon Police Department. P.O. Van informed me that he was home on the night in question with his mother watching Monday Night Football.

**DEFENDANTS 552**

December 13, 2004

P.O. Van, as instructed, responded to police headquarters and provided Chief Moppert with documents backing his assertion that no disciplinary charges would be filed against him by North Haledon. The document was signed by the borough attorney.

P.O. Van also provided letters of good conduct from the former chief of police in North Haledon, and the North Haledon fire chief. Other correspondence of like kind was provided.

Furthermore, P.O. Van provided an inventory of police equipment he turned in to the North Haledon Police Department, specifically noting the relinquishing of his North Haledon Police badge and identification.

December 15, 2004

On December 14, 2004, several attempts were made to obtain records from the New York City Police Dept. in order to verify or dispel the allegation made by the North Haledon Police Department. I was informed on two separate occasions that the NYPD computers were down and inaccessible. On December 15, 2004 I again made inquiry regarding the allegation by the North Haledon Police and was unable to reach the records room of the NYPD.

Chief David Moppert was advised of my findings.

Note: No member of the North Haledon Police Department, in an official or unofficial capacity, made this agency aware of these allegations. Attempts by Chief Moppert to confer, via telephone, with the North Haledon chief of police were unsuccessful. No return call has been received from anyone affiliated with the North Haledon Police Department.

1/5/05

17:00 hours

I telephoned the Midtown North Police Precinct of the N.Y.P.D. (212-760-8300) and spoke with Lt. Heraghty, Desk Officer. I made inquiry with regard to the alleged incident on November 24, 2004 at the China Club. Lt. Heraghty referred me to Lt. Stadina, the ICO officer (212-767-8437). Lt. Stadina may be reached during the daytime hours. In addition, Lt. Heraghty suggested that I contact the China Club (268 W. 47 Street, NY, NY, 10036; Tel. 212-398-3800) and obtain information from their in-house records.

I telephoned the China Club and spoke with Ms. Joan Flinkman, the night manager. Ms. Flinkman was advised of the nature of my call, and a request for information pertaining to this investigation was made.

DEFENDANTS 553

Ms. Flinkman referred me to Mr. Tim Gleason, the General Manager, who was currently unavailable. Ms. Flinkman assured me that Mr. Gleason would be made aware of my request and would return my call with any information regarding this matter.

1/10/05

11:55 hours

Mr. Tim Gleason, General Manager of the China Club, telephoned and provided me with the following information: Mr. Gleason was presented with the allegations regarding Officer Mark Van and the particulars of the case.

Mr. Gleason referred to a file maintained by the China Club documenting incidents occurring on their premises and discovered that on the evening of November 22, 2004, no incident(s) were logged.

Mr. Gleason could not provide any additional information with regard to this investigation.

DEFENDANTS 554

EXHIBIT 16

      I believe you just indicated there was some form of an attorney general regulation or guideline that would require a police officer to advise his employer if he was being investigated by another department?

    A    Yes, I believe that.

    Q    Would you know offhand where that would be located or what document those regulations would be contained in?

    A    No. It's always been a general knowledge or if you're being investigated, you have to at least notify your immediate supervisor you are being investigated. You have to say where is that document. I would have to say I would have to look it up.

    Q    You do believe such a regulation or guideline exists somewhere?

    A    I believe so, yes.

    Q    Once the two North Haledon police officers confronted Mark Van with their investigation do you feel he was obligated at that point to come and advise you of what was going on?

    A    I think he should have, yes. I understand why he did not also, but I do understand that he wanted to, but maybe based on the time the day before Thanksgiving give me the heads up there's something here, I'll talk about it.

1  It's no big deal. I didn't do anything wrong
2  and this will all come out in the sauce and speak to me
3  about it. I honestly feel he felt he was doing the right
4  thing.
5       Q    I'm not clear.
6       You as chief and supervisor of any police
7  officer working in your department, they were confronted
8  with an investigation into their activities by another
9  police department, you feel that they would be obligated
10 to come to you with that information?
11      A    Well, at least I feel they're obligated to
12 come and advise to let them know they're being
13 investigated by another law enforcement agency.
14      Q    Did Mark Van ultimately divulge to you that
15 he was confronted by these two police officers?
16      A    Absolutely.
17      Q    Was that after receipt of the anonymous
18 letter or before if you know?
19      A    I would be guessing.
20      Q    Now, up until the point in time this
21 anonymous letter had been received, how would you have
22 rated or critiqued Mark Van as a probationary police
23 officer up to that point as far as his performance?
24      A    I thought Mark was doing very well.
25      Q    Now, you were asked a question before if the

**EXHIBIT 17**

Page 54

1  Lakeside, where I'm the President for the Association
2  that I live. It's a new townhouse development and I
3  had a meeting until 9:30, so I don't recall even how I
4  would have had an opportunity to. I didn't take any
5  calls.
6       Q.   I'm not -- my question is not whether
7  you had an opportunity, my question is very simple.
8  Did you have any discussion at all yesterday by phone
9  or in person or any other way with Detective Parenta?
10 A.   I don't recall speaking to Detective Parenta,
11 yet I'm not sure if it was a couple of days ago.
12      Q.   It may be that you did talk to him and
13 you just don't recall, is that what you're saying?
14 A.   I guess it's a possibility, yes. I'm not
15 certain because of how busy I was yesterday.
16      Q.   If you did talk to Detective Parenta,
17 do you know whether his deposition has been taken or
18 not in this case?
19 A.   I believe I learned that from my attorney.
20      Q.   I don't want you to tell me what he
21 said. I want to know if you know that a deposition
22 has been taken of Detective Parenta?
23 A.   That's how I learned the deposition had been
    taken was from my attorney.
25      Q.   Do you know who Lieutenant Darby is?

Page 55

1  A.   Yes, I do.
2       Q.   Did you speak to Lieutenant Darby
3  yesterday?
4  A.   I did not.
5       Q.   Let me understand you. You remember
6  specifically that you didn't speak to Lieutenant
7  Darby, but you're not one hundred percent positive one
8  way or the other whether you spoke to Detective
9  Parenta, is that your testimony?
10 A.   I know I haven't spoken to Detective Darby in
   quite a few days, but I have spoken to Detective
   Parenta. I'm pretty confident it was not yesterday.
        Q.   Do you ever recall a couple of days or
   rtly before the badge issue, I'll refer to it as
   badge issue with Mark Van.
        Before that came to your attention, do you
        ll shortly before that Detective Parenta coming in
   d telling you that Mark Van was a police officer at
   the Harrington Park Police Department?
        A.   A couple of weeks before the badge incident?
        Q.   Or shortly before?
22 A.   I guess that's a possibility, yes.
23      Q.   Do you remember what your response was
24 when you found out, if you made any response?
25 A.   I don't recall. I don't recall saying

Page 56

1  anything.
2       Q.   When you found out that he was
3  working as a police officer in Harrington Park,
4  irrespective of how you found it out, what was your
5  feeling about it?
6  A.   I was happy about it.
7       Q.   You were happy about it?
8  A.   Yes.
9       Q.   Do you know any officers from
10 Harrington Park?
11 A.   No, I don't. I don't know who is on their
12 department.
13      Q.   I understand you're not aware that you
14 know anybody there.
15      So, now tell me when is the first notice that
16 you have or first information that you receive
17 regarding Mark Van and the issue related to the badge?
18 A.   The first information I got?
19      Q.   Yes?
20 A.   I guess the day before I assigned Lieutenant
21 Darby and Detective Parenta to go to Harrington Park,
22 Detective Parenta came into my office and told me
23 about information he had got from Sergeant Rowe who is
24 on my department also.
25      Q.   What information, what information did

Page 57

1  he tell you he received from Sergeant Rowe?
2  A.   He said that Sergeant Rowe had received a
3  phone call from a mutual friend of Mark Rowe.
4  Sergeant Rowe received information from a friend who
5  got information from a Lieutenant in New York City
6  that Mark Van or someone using Mark Van's
7  identification was in New York City in a club, got
8  into an altercation and displayed his badge.
9       Q.   And do you recall that the
10 information was communicated to you that this mutual
11 friend or friend that communicated this to Mark, to
12 Sergeant Rowe, had a friend in New York who was a
13 Lieutenant. Is that what you recall?
14 A.   Yes.
15      Q.   And did anyone give you a name of who
16 this Lieutenant was?
17 A.   No. So I said to Detective Parenta, I want to
18 see Mark Rowe about this and he advised Sergeant Rowe
19 to come in to see me. I believe he came in that day.
20      Q.   And you did get Mark Rowe in?
21 A.   Yes.
22      Q.   What was your conversation with Rowe?
23 A.   He reiterated what Detective Parenta had told
24 me. I said I want a written report from this
25 Lieutenant, as well your friend in whatever department

15 (Pages 54 to 57)

EXHIBIT 18

Page 62

1   Q.   At that time?
2   A.   Yes.
3   Q.   He came into your office and
4   essentially told you that someone, potentially Mark
5   Van, had committed a crime, am I correct?
6   A.   Okay.
7   Q.   Do you agree with me?
8   A.   Okay. Yes.
9   Q.   And then you specifically brought Rowe
10  in your office to find out what he knew; am I correct?
11  A.   Yes.
12  Q.   Did you ask him who had called him?
13  A.   Sure.
14  Q.   What did he say?
15  A.   They don't want to get involved. They are
16  just giving us information. There are no charges.
17  You can't force people to give that information.
18  Q.   Did you ask Mark Rowe -- I'm sorry.
19  Did you ask Sergeant Rowe to at least tell you who it
20  was that gave him the information?
21  A.   I didn't press the issue. I didn't see any
22  reason to. They don't want to get involved. They are
23  just alerting us that one of our officers had a
    problem in New York City.
    Q.   Why did you want a report from them to

Page 63

    in with?
    A.   To begin a full investigation.
    Q.   When people don't cooperate with an
4   investigation, is that appropriate?
5   A.   I don't -- if you get a written report, that's
6   the rational to begin an investigation. If you don't
7   get a written report, that's hearsay. I don't begin
8   investigations on hearsay.
9   Q.   Chief, I'm really trying to understand
10  this. Let's say Fort Lee Police calls you up. You're
11  the Chief, and they say, listen, a cop in your town
12  beat someone up last night in a Fort Lee bar and he
13  had his uniform on and he was drunk out of his mind.
14  You say to that officer, well, Officer, I want a
15  written report from you. That officer said no, I'm
16  not giving you a written report. Do you think that
17  would be appropriate?
18  A.   Do I think it would be?
19  Q.   Yes?
20  A.   No, I would contact the Fort Lee Chief and
21  tell him what they had said and if they still refused
22  to give me a report, then I wouldn't do anything. I
23  wouldn't have a choice.
24  Q.   So why did you --
25  A.   I might -- can I finish?

Page 64

1   Q.   Yes, I'm sorry.
2   A.   I might talk to the Officer that they named
3   and if he denied it, I wouldn't have anything to start
4   an investigation.
5   Q.   Why didn't you press Sergeant Rowe for
6   the name of the person who gave him this information?
7   A.   Why didn't I?
8   Q.   Yes?
9   A.   Because nothing happened, they let him go.
10  Q.   Now, you spoke to Mark Rowe before
11  they -- strike that.
12       Nothing happened, they let him go. What does
13  that mean?
14  A.   Mark Van was not charged, whoever displayed
15  the badge or got into that altercation, they weren't
16  charged. This is a heads-up. One of your guys was
17  involved here in New York City. We're just giving you
18  a heads-up. There was no charges against that person.
19  Q.   I understand, but when Mark Rowe came
20  in and told you Van wasn't one of your guys any
21  longer?
22  A.   That was the reason that Mark Rowe came in to
23  tell me.
24  Q.   Did Mark Rowe come in to tell you or
25  did you ask to talk to Mark Rowe?

Page 65

1   A.   I asked to talk to him, but he came in to tell
2   me what he knew I wanted to know.
3   Q.   When you're talking to him did you say
4   to him where did you get this information from?
5   A.   I did.
6   Q.   And his response was, I can't tell
7   you, Chief?
8   A.   My friend who works in, he may have said the
9   department, who is friends with this Lieutenant in New
10  York City.
11  Q.   And did you then say to him who is
12  your friend?
13  A.   I did not. I said, I want a written report
14  from both of them before I start an investigation. He
15  said they won't do it and he explained why, the same
16  thing he told Dave Parenta that Dave Parenta had told
17  me the day before or the morning before, the morning
18  before.
19  Q.   Well, did Dave Parenta before you sent
20  him up to Harrington Park, did you ever have any
21  further discussion with him about what efforts he made
22  to find out who reported this information?
23  A.   No. I got it from the source. The source was
24  Mark Rowe, that's who gave it to Dave.
25  Q.   Well, Parenta has indicated in a

17 (Pages 62 to 65)