EXHIBIT 19



**CONFIDENTIAL**

# Borough of North Haledon

## POLICE DEPARTMENT

103 OVERLOOK AVENUE
NORTH HALEDON, NJ 07508

TELEPHONE    973 423-1111
FAX          973 304-0222

*"Strive for Perfection"*

### Chronological Report

Received information from Sgt. Marc Rowe on November 23, 2004 about ex-employee Mark Van who was allegedly involved in an incident in New York City on or about Monday, November 22, 2004. The relevance being that Mark Van allegedly identified himself as a North Haledon Police Officer when asked for his identification. Furthermore, he showed a North Haledon Police badge and identification according to the information received by Sgt. Rowe. This information was then forwarded to Chief Joseph Ferrante who said that Van was supposed to give back his badge and identification when he resigned a few years back. I spoke with Officer John Centrello of the Dumont Police Department who had originally given Sgt. Rowe this confidential information and he repeated to me what was told to him by an officer in the New York City Police Department. Centrello would not divulge the name of the New York City officer. The information was given to us purely out of concern that one of our officers had behaved questionably while at the China Club in New York City. Centrello said that Van had been disrespectful and knowing that Sgt. Rowe is a supervisor, perhaps he could speak with Van. At this time Sgt. Rowe informed Centrello that Van was no longer an employee with our department, which raised obvious concerns. Chief Ferrante instructed Lt. Darby and I to contact Van. We had no means of contacting Van other than at his place of employment at the Harrington Park Police Department. We were told to retrieve the badge and identification immediately. We responded to Harrington Park at approximately 2:30 p.m. on November 24, 2004 where he was on duty that day, parked in the police parking lot and exited our vehicle. As we were walking to the headquarters entrance, we were met by Van in the parking lot. We explained why we were there and Van asked us if we could talk at a location away from his work. We agreed and followed him to the shopping center in Emerson where we spoke further about what we were told. Van denied being at the China Club or even being in New York City. He also denied

**CONFIDENTIAL**    DEFENDANTS 011

using or even having the badge and identification from his previous employment. He claimed that this was harassment and we told him that we were merely following up on an alleged incident involving The North Haledon Police Department's property and that he identified himself as one of our employees. We assured Van that Chief Ferrante just wanted the property back and we could have gone straight to his employer if we had wanted to. Van appeared to be angered by our questioning and threatened us that we would be hearing from his attorney. We left without incident and referred our findings to Chief Ferrante.

Respectfully submitted,

Det. David C. Parenta

**CONFIDENTIAL**

EXHIBIT 20

## AFFIDAVIT

I, Chief David J. Moppert, of full age, deposes and says:

1. I make this affidavit so as to memorialize and attest to certain information I posses regarding Mark Van.

2. In the month of December, 2004 I became aware of an anonymous letter forwarded to the Mayor of Harrington Park, regarding Patrol Officer Mark Van. This letter indicated that Mr. Van was fired by several other employers but did not give any specifics, and also advised that he had been administratively charged by a former employer, the North Haledon Police Department.

3. I also became aware that Mark Van had been approached by two North Haledon Police Officers while on duty and in a marked car. This contact occurred in the parking lot of the Harrington Park Police Department. It is my understanding that Mr. Van at that time was accused of improper use of a police identification, in an incident which is alleged to have occurred on November 22, 2004 at a New York City nightclub. As part of an internal affairs investigation, I contacted Chief Ferrante of the North Haledon Police Department. This contact occurred through a telephone call which I made to Chief Ferrante. In that telephone conversation Chief Ferrante advised me that he had received a phone call from a friend of his in the New York City Police Department which provided information that Mr. Van had improperly used a North Haledon police identification. As part of the investigation I made inquiry of Chief

Ferrante as to the name and identity of his friend, yet Chief Ferrante would not disclose this information. In this conversation Chief Ferrante further stated that we should meet sometimes and he would tell ~~we~~ me about Mark Van.

4. I provide this information so as to memorialize the events which are set forth in this Affidavit.

Dated: May   , 2005

_____
Chief David J. Moppert

Sworn and Subscribed to
before me on this 16th
day of May, 2005

_____
(Notary)

SUSAN S. NELSON
NOTARY PUBLIC OF NJ
COMMISSION EXPIRES MARCH 9, 2009

EXHIBIT 21

**Page 10**

1  only thing we do at the end very background check NCIC,
2  call the Division of Pensions and we called PTC to make
3  sure they're certified.
4  Q  What's PTC?
5  A  Police Training Commission and if they're
6  certified, it's kind of all that background is already
7  done for you and we hire them. Of course we have to
8  fingerprint them once they're employed and we know we have
9  the one year termination of probation.
10  Q  But just so I understand so probationary
11  officer when he interviews wouldn't be a background check
12  normally, correct?
13  A  We would do a background check, but it
14  wouldn't be--we didn't do an application at the time. We
15  just did resume and we did do a background check, but just
16  resume.
17  Q  This is just in general, since you've been
18  chief if an applicant for a probationary officer status,
19  if he didn't disclose previous employment as a police
20  officer, would you have a problem with that as the chief?
21  A  If I had the hindsight to know that, yes.
22  Q  What do you mean if you had the hindsight?
23  A  Well, ever since the Mark Van incident we've
24  changed our way of doing things. We never did an
25  application before Mark.

**Page 11**

1  After this incident with Mark with the
2  anonymous letter, we have now decided to cover our bases
3  and do an application, but I figure if you work with
4  somebody for ten years who's a police captain and police
5  chief and this guy has been working with him for ten years
6  who's the better person to judge status of somebody than
7  this recommendation you're getting from a police captain,
8  especially somebody who's our next door neighbor of the
9  community he lives in.
10  Q  So you would want to know then all previous
11  police department employment from a probationary officer
12  applicant, correct?
13  A  Yes. I would like to know that, yes.
14  Q  If the officer didn't tell you during this,
15  his probationary period, would that be enough for you to
16  want to terminate him or would it depend on the
17  circumstances?
18  A  It would depend on the circumstances.
19  Q  I'm going to show you, we've had some other
20  depositions in this case so there's some exhibit numbers
21  already marked, but I'm going to show you some documents
22  and I'll ask you some questions about them.
23  Let me show you. These were marked Van-6 and
24  7. I want you to take a look through them and tell me if
25  you recognize both the documents.

**Page 12**

1  A  Yes, 6 I recall. I believe these two
2  documents kind of came at the same time.
3  Q  So you recognize Van-6 and 7?
4  A  Yes.
5  Q  Just on the last page of each exhibit I
6  believe your signature is there; is that correct?
7  A  Correct. That is my signature.
8  Q  Just for the record, if Van-6 is a May 3rd,
9  2005 letter from you to Mark Van, would you agree with
10  that characterization?
11  A  That is correct.
12  Q  And the subject is in general his termination
13  from Harrington Park. Would you agree with that?
14  A  Yes.
15  Q  Van-7 is a May 3rd, 2005 separation agreement
16  again arising out of advance termination. Would you agree
17  with that?
18  A  Yes, I would.
19  Q  Do you recall the reason for his termination
20  from Harrington Park?
21  A  Well, it was accumulation of things. Mark
22  was a probationary officer. We had received anonymous
23  letters that we were--I had with Lieutenant Maloof had
24  started IA investigation in regards to a China Club
25  incident, then the mayor received an anonymous letter from

**Page 13**

1  Westchester County with numerous, three page letter of
2  numerous allegations. We started an IA investigation on
3  that.
4  Then he became injured in January 2005 and
5  Jeff was constantly on the phone with me complaining about
6  his not going to doctors and I fought in Mark's regard in
7  regard to some of the instances and in other regards. I
8  told him look, you got to go to these doctors and he just
9  didn't go.
10  Based on the accumulation of everything, he
11  was on probation. Our conversation back in 2004 was
12  simply chief, give me a chance and if things go south
13  terminate me and I basically went on that concept and
14  called legal and told them my problems and that we needed
15  to especially now in this gyp paper with him not going to
16  the doctor, we needed to terminate Mark and I made it very
17  clear to Mark if he did not go to the doctor I would have
18  to make that recommendation.
19  Q  So would you say that really once the refusal
20  to go to the doctors came about that really was the straw
21  that broke the camel's back?
22  A  I would say so, yes.
23  Q  Your attorney produced several documents
24  today. One of them is folder called Mark Van IA December
25  11, 2004?

4 (Pages 10 to 13)

EXHIBIT 22

# FAUGNO & ASSOCIATES, L.L.C.
───────── ATTORNEYS AT LAW ─────────

PAUL FAUGNO°
   CERTIFIED BY THE SUPREME COURT
   OF NEW JERSEY AS A CIVIL TRIAL ATTORNEY

LISA G. MAYER*

OF COUNSEL
   MICHAEL A. QUERQUES†
   CYRULI SHANKS AND ZIZMOR LLP~

° MEMBER N.J. AND FEDERAL BAR OF N.J. AND D.C.
† MEMBER N.J. AND D.C. BAR
* MEMBER OF N.J. AND FEDERAL BAR OF N.J. AND U.S. TAX COURT
~ MEMBER OF N.J., N.Y. AND CT. BAR

125 STATE STREET
SUITE 101
HACKENSACK, NEW JERSEY 07601

TEL: (201) 342-1969
FAX: (201) 342-2010
E-MAIL: PaFaug@aol.com

December 9, 2004

**CMRRR and Regular Mail**
Mayor and Council
Borough of North Haledon
103 Overlook Avenue
North Haledon, NJ 07508

**CMRRR and Regular Mail**
North Haledon Police Department
103 Overlook Avenue
North Haledon, NJ 07508

Attn:    Chief Joseph Ferrante

Re:  Mark L. Van v. North Haledon, Et al

To the Mayor & Council:

    Please be advised that the undersigned has been retained to represent Mr. Mark L. Van in regard to the above captioned matter. Mr. Van, a former police officer with the Township of North Haledon, has found it necessary to retain my services because of a series of very disturbing events.

    In particular, on November 24, 2004 two Township of North Haledon Police Officers appeared at the Harrington Park Police Department, which is Mr. Van's present employer. Mr. Van recognized these officers and asked them what they were doing in Harrington Park. At that point, these officers who were acting in their official capacity, advised Mr. Van that they were there at the direction of Chief Ferrante, and that they were conducting an investigation into Officer Van's activities. Specifically, they advised that they received reports from the New York City Police Department indicating that Mr. Van had illegally used a badge obtained from North Halendon in some form of attempt to avert a problem that he was involved in at an establishment known as the "China Club" located in New York City. In essence, these officers were advising Mr. Van that they were investigating an allegation that he had committed a criminal act.

Mr. Van advised them that he had no knowledge of any such circumstances and essentially had no idea as to what they were talking about.

Officer Van has advised the undersigned of a long history of conduct on the part of Township of North Halendon officials and employees which are harassing in nature. Given this pattern, Officer Van has every reason to believe that the actions by the police officers previously referenced were a further attempt to harass him.

Needless to say, if it is determined that no valid investigation was being conducted by these two officers, this amounts to very disturbing and serious infractions. To advise any citizen, in particular a police officer, that they have committed criminal wrongdoings, if in fact there was never any such allegation would amount to violation of the criminal laws of the State of New Jersey in addition to a breach of the oath that all police officers swear to.

Please accept this correspondence as an immediate demand that all agents, servants and/or employees of the Township of North Haledon immediately cease and desist from any further actions which constitute harassment and illegalities being perpetrated towards Mr. Van. Further, also immediately cease and desist from any contact with Mr. Van, his family and/or his employer and all future communication shall be directed to this office.

This correspondence is not intended to be a formal notice of intent to make claim, as it will be filed under separate cover if the circumstances so dictate.

Thank you for your anticipated cooperation.

Very truly yours,

FAUGNO & ASSOCIATES, LLC

By _____
    Paul Faugno

PF/sp

**EXHIBIT 23**

he-phone if he had been working nights.

    Q    Did he call you when you were on duty?

I don't recall.

    Q    I mean, would he have called you at
or is that possible?

He would have called me on my cell phone, if
ing.

    Q    And I'll show you your report since you
to refresh your recollection as to dates.

    MR. FAUGNO: This is a packet of all the
stuff I may refer to. That's different than what
you have. Some of it is the same. The one I'm
going to refer to now I don't think you did mark
and they're not stapled, but there's a stapler
here if you want to staple it. I got a copy for
you, too. Why don't we mark this P-1 for
identification.

    (Whereupon document is received and
marked P-1 for identification.)

    Q    Do you recognize what's in front of
marked as P-1 for identification?

Yes.

    Q    Can you tell me what that is?

It's my report regarding the incident.

    Q    When was this report done?

```
 1   A         December 16, 2004.
 2   Q         How do you know it was done December
 3   16, 2004?
 4   A         I checked when the file was created this
 5   morning when I came to work.
 6   Q         What file are you talking about?
 7   A         This file that was created when the report was
 8   completed.
 9   Q         Let me just explore that a second.  Is
10   there some file that that document marked P-1 came out
11   of?
12   A         Yes.
13   Q         And you went through that file this
14   morning?
15   A         Yes.
16   Q         Is that file here?
17   A         Yes.
18   Q         Can I take a look at that, please?
19            MR. RAINONE:  I'm sorry, when you say
20   file, what do you mean?
21   Q         Well, let me ask you, what did you look
22   at this morning?
23   A         A file on the computer.
24   Q         Oh, a file on the computer.  So it
25   wasn't -- it's not a physical file, it's on a
```

EXHIBIT 24

# Borough of North Haledon

## POLICE DEPARTMENT
103 OVERLOOK AVENUE
NORTH HALEDON, NJ 07508

TELEPHONE  973 423-1111
FAX             973 304-0978

**Joseph Ferrante**
**Chief of Police**

Office: 973 423-1401
Fax:     973 304-0222

*" Strive for Perfection "*

December 17, 2004

*RECEIVED DEC 20 2004*

Paul Faugno, Esq.
Faugno & Associates, L.L.C.
125 State Street, Suite 101
Hackensack, New Jersey 07601

Re:   Mark L. Van v. North Haledon, et al.

Dear Mr. Faugno,

I am in receipt of your letter dated December 9, 2004 accusing North Haledon Police officers of harassment. As you may know, N.J.S.A. 2C: 21-2.2, prohibits the transfer of a law enforcement badge to anyone, "other than a member of a law enforcement agency" without the authorization of the "commanding officer of that law enforcement agency."

I have recently received a North Haledon investigative report indicating that on or about Monday, November 22, 2004, someone identifying himself as Mark Van, was allegedly involved in an incident at an upscale nightclub in New York City involving an on-duty NYPD (New York Police Department) officer. Mr. "Van's" disrespectful conduct to the officer prompted a demand for identification. Mr. "Van" allegedly then displayed a North Haledon Police badge and identification card.

A North Haledon sergeant accepted a phone call regarding "Officer Van's" conduct; the information he received regarding the incident was forwarded to the North Haledon Detective Bureau. Since Mark Van resigned from the North Haledon Police Department several years ago, I was concerned that he, or someone, posing as Mark Van, possessed a badge and identification belonging to the Borough of North Haledon. Consequently, I assigned a detective to investigate the matter.

Mark L. Van – December 17, 2004
Page two

The officers from other jurisdictions who gave the information to North Haledon claimed that they alerted our department of the improper conduct by one of our officers as a courtesy, and, consequently, they refused to send a written report confirming the incident. I directed my officers to ask Mark Van about the incident, and, if necessary, to retrieve any property belonging to North Haledon, if, indeed he did possess any.

When it was reported to me that Mr. Van denied knowing anything about the incident in New York City, or possessing any property belonging to North Haledon, I advised the Detective to close the case, indicating that Mr. Van's word was good enough for me.

I fail to see how that was harassing to Mr. Van. I received information that a former North Haledon Police officer was illegally in possession of a badge and identification certificate. I initiated an investigation to confirm or deny the facts, which ended when Mr. Van denied any involvement.

If, and/or when, Mr. Van chooses to take formal action regarding this matter, confidential investigative reports, statements, telephone tapes, etc., may be requested from the North Haledon Borough Attorney:

> James V. Segreto, Esq.
> Segreto and Segreto
> 565 High Mountain Road
> North Haledon, NJ 07508

Yours truly,

Chief Joseph Ferrante

EXHIBIT 25

```
 1        A.      When I called him, sir?
 2        Q.      Yes.
 3        A.      When I called him it was in reference
 4   to an individual who I didn't know whether he was
 5   still working in Harrington Park or had left the
 6   Harrington Park Police Department.  Basically I had
 7   contacted him giving him information from regards to
 8   what Mark Rowe had told me, a former member of the
 9   North Haledon Police Department.  Should I tell you
10   the whole story?
11        Q.      No.  I will ask some questions.  We
12   will get to it.  What prompted you to call Mark
13   Rowe?
14        A.      Got ya.  There was a gentleman that I
15   was an acquaintance with.  Not even friends with.
16   His name was James Lanari.
17        Q.      Can you spell that?
18        A.      I'm guessing.  L-a-n-a-r-i.  I'm not
19   a hundred percent sure on that last name spelling.
20   He had told me -- I see him from time to time at the
21   gym where we workout.  That's World Gym in Paramus.
22   And it's no more than hi, how you doing, how's work
23   going, fine.  That was it.  He had approached me
24   with another gentleman by the name of Anthony
25   Blandino of the Norwood Police Department.
```