**EXHIBIT 43**



**9**

1    Q.  And what period of time did you walk the
2  beat?
3    A.  From June of '73 until December of '73.
4  That was some walking, mostly driving.
5    Q.  Okay. And your position in the
6  Jacksonville police department?
7    A.  Well, it is office of sheriff, Jacksonville
8  police department.
9    Q.  That period, the six month period, you
10  walked the beat as a patrolman, correct?
11    A.  That's correct that was my status,
12  patrolman.
13    Q.  Have you ever been higher than a patrolman?
14    A.  No. By election, that has always been what
15  I have been studying, so I've always been a patrol
16  officer.
17    Q.  So you've never been chief, a captain a
18  lieutenant or supervisor?
19    A.  No, I've never been a supervisor.
20    Q.  Have you ever had responsibility for hiring
21  and firing police officers?
22    A.  No.
23    Q.  Now, you mentioned that you updated your CV
24  probably around October of 2007?
25    A.  Right.

**11**

1  you estimate?
2    A.  Probably 90, sometimes 95 percent is civil
3  and the balance criminal.
4    Q.  And so back to my other question, what
5  percentage of the civil cases would you say you consult
6  on behalf of plaintiffs?
7    A.  Rough estimate would be somewhere between
8  60 and 70 percent plaintiffs, the balance defense.
9    Q.  What percentage of your civil cases involve
10  police investigative procedures?
11    A.  Well, let me answer it in this way: Of my
12  civil cases, there are two major categories, premises
13  liability crime prevention and police. With regard to
14  police, there are quite a number of sub areas, and it
15  would be difficult for me to differentiate other than
16  to say that a minority of them involve investigative
17  procedures.
18    Q.  Okay, I'll tell you what: Of your civil
19  case load, what percentage involve premises liability
20  and what percentage involve police issues?
21    A.  About half and half right now.
22    Q.  Okay, so of the half that are police --
23    A.  Right.
24    Q.  -- what is your best estimate of the
25  percentage that involve police investigative

**10**

1    Q.  And as it states now you've been involved
2  in some 1,500 cases?
3    A.  Approximately.
4    Q.  So is that number still an accurate
5  estimate?
6    A.  It changes from day to day and week to
7  week, but it would be the closest approximation I could
8  give you.
9    Q.  How long have you been performing
10  consultant work for civil litigation?
11    A.  Since about -- initially about 1974 or
12  '75, somewhere right in there.
13    Q.  How much of your annual income would you
14  say you get from consulting on civil litigation?
15    A.  Oh, the vast majority of it, 95 percent,
16  other than University retirement and investments and so
17  on.
18    Q.  And all these cases that you have been
19  consulting in, what percentage would you say you have
20  consulted on behalf of plaintiffs?
21    A.  By the way, just parenthetically, I also
22  consult in criminal cases. Mostly civil, though.
23  Probably about 90 percent civil.
24    Q.  I'll tell you what, of your entire case
25  load, how much is civil and how much is criminal would

**12**

1  procedures?
2    A.  I couldn't tell you other than to say that
3  I have had many of them over the years, but I would be
4  guessing and I don't want to guess. I couldn't
5  quantitate it.
6    Q.  Are there documents that you have that you
7  could look at to tell me what the percentage is?
8    A.  There really are not. I've never
9  memorialized anything regarding cases in terms of a
10  breakdown of different -- because there are so many
11  different categories of police pursuit -- use of
12  force, hiring procedures, investigative procedures.
13    Q.  Okay. So there is no way you could tell me
14  what percentage of your police cases involve
15  investigative procedures?
16    A.  No, other than to say that I have had a
17  great many of them over 30 years, no. I couldn't
18  quantitate it.
19    Q.  And there are no documents you could look
20  at for that?
21    A.  No.
22    Q.  If you had to find out, what would you do
23  to find out?
24    A.  There was a time when I knew every case and
25  every attorney. I would have to go to my reference

**EXHIBIT 44**

**13**

1  list which runs from A to Z and which is very, very
2  lengthy and try to recall going through the names of
3  the attorneys. Oh, yes, this was an investigative
4  case, that was an investigative case. It is very
5  difficult in the amount of time that has passed and the
6  fallibility of memory to frequently recall is it a
7  police case or was it a premises case? Let alone what
8  type of police case it was unless it stands out for
9  some reason.
10      Q.  How long do you think it would take you to
11  go through that list? Two weeks?
12      A.  Quite a bit of time. I should imagine,
13  yes. I would think depending upon how much time you
14  spent ruminating on each -- it is just listed by
15  attorney name and location. It would be very, very
16  time consuming, I should think, to go through and try
17  to you know, tease your memory and recall each one. It
18  would be very difficult and then from that to try to
19  extract for example, I probably had more firearms cases
20  than any other category. Which ones were firearms? I
21  don't think I could reconstruct that to a very
22  successful degree over so many years, all 50 states.
23      Q.  You just said you have had significantly
24  more firearms cases.
25      A.  Right.

**14**

1      Q.  Would you estimate that your police
2  investigation cases are more or less than 10 percent of
3  your police cases?
4      A.  I'm reluctant to try to quantitate it,
5  because I just don't know. I would tell you that the
6  other categories -- firearms, vehicular pursuit, less
7  than deadly force -- would surely be larger categories
8  than police investigative procedures, but that has been
9  a significant category. Whether it is 10 percent or 15
10  percent, I wouldn't think it would be over 20 percent,
11  but I just don't know. I don't have a number that I
12  could give you.
13      Q.  Do you consider yourself an expert in
14  police investigative procedures?
15      A.  Oh, yes. I'm thoroughly conversant with
16  professional standards that have existed for many years
17  regarding the conduct of police investigation, though I
18  have limited personal experience as a police
19  investigator.
20      Q.  Is it fair to say you don't have
21  significant experience as a police investigator?
22      A.  That is a fair statement.
23      Q.  Is it fair to say you don't have any
24  educational experience as a police investigator?
25      A.  That is true as well.

**15**

1      Q.  Is it fair to say you have no background as
2  a police investigator?
3      A.  No personal background, though again, I'm
4  thoroughly conversant with the professional literature,
5  the professional standards that exist and have existed
6  for many years throughout the United States regarding
7  police investigative procedures including internal
8  affairs matters.
9      Q.  Have you ever reviewed police investigative
10  procedures that are specific to the state of New
11  Jersey?
12      A.  Only if I have had a case and I've had
13  numbers of cases in New Jersey over the years that has
14  involved a matter of police investigation. As I sit
15  here, I don't know. I can remember use of force cases
16  in New Jersey, perhaps pursuit cases, but I don't know
17  what I have had up there investigativewise.
18      Q.  Well, that is the important question. What
19  police investigative procedures specific to New Jersey
20  have you ever reviewed?
21      A.  Yes, I can't tell you that. I just don't
22  know.
23      Q.  How would you find out?
24      A.  Again, I would have to go back and look at
25  all the New Jersey cases I have had over the years

**16**

1  through hundreds of law firms and try to recall which
2  of these would have had something to do with
3  investigative procedures as opposed to other things.
4      Q.  Did you look at any investigative New
5  Jersey investigative procedures when you prepared your
6  report in this case?
7      A.  No, I --
8      Q.  Thank you, Doctor.
9      A.  I'm sorry.
10      Q.  In your CV there is a point where you state
11  that you worked with four law enforcement agencies
12  regarding criminal investigations. What four agencies
13  were those?
14      A.  There are -- four agencies I work with were
15  chronologically, office of Sheriff Jacksonville police
16  that we have talked about during '73 for six months.
17  Then the Tallahassee police department from I think I
18  was sworn in there in May of '74 parallel with my
19  university career up until I tendered my resignation I
20  think around August of '91 and overlapping with that
21  period of time, I worked for two years with Leon County
22  sheriff's department.
23      Q.  Is that in Florida?
24      A.  It is in Tallahassee, yes, their criminal
25  investigation division on a part-time basis until there

**EXHIBIT 45**

17

1  was an Attorney General's ruling that you couldn't be a
2  sworn officer with two agencies simultaneously, so I
3  resigned that commission and kept the police department
4  commission.
5          And then one summer under a grant from the
6  U.S. department of justice I worked as an undercover
7  officer as part of a federal strike force in Fort
8  Lauderdale, Broward County. That was for three months.
9      Q.  In your CV on that same topic of the
10 Florida agencies you worked with, there was a point
11 where you state that you worked on assignments as
12 diverse as, and one of them was criminal investigation.
13     A.  Right.
14     Q.  What is your definition of a criminal
15 investigation?
16     A.  Well, criminal investigation basically
17 involves the investigation of alleged criminal activity
18 on the part of someone. And it may be accomplished in
19 a variety of contexts as referenced what you just re.
20 I did investigative work undercover and I did some of
21 it as a -- as a detective with the sheriff's
22 department.
23     Q.  Did you ever do any criminal investigations
24 as a police officer in New Jersey?
25     A.  No, no.

18

1      Q.  And just so I am correct, you were never
2  higher than a patrolman as a police officer, correct?
3      A.  Correct.
4      Q.  And you've never been a police officer in
5  New Jersey, correct?
6      A.  That's correct also.
7      Q.  Doctor, what is your average annual income
8  for the past five years?
9          MR. FAUGNO: I'm going to object to that,
10     but you can answer.
11         THE WITNESS: Again I'll have to give you
12     my best estimate.
13 BY MR. RAINONE:
14     Q.  I won't tell the IRS.
15     A.  That's all right. I deal with them all the
16 time. I have a Florida sub S corporation I've had for
17 about 30 years now and I operate sole officer under it.
18 And I would say I am -- I gross probably 250 to
19 $300,000 from which I derive an income after expenses.
20     Q.  And that is for your consulting work,
21 correct?
22     A.  Correct. That's all consulting.
23     Q.  Over the past five years, just as to your
24 police cases, what percentage of those civil police
25 cases were you consulting for a plaintiff?

19

1      A.  Of police cases, probably -- probably I
2  would say over the last five years, close to 70 percent
3  would be my best estimate.
4      Q.  On your CV you list yourself as a former
5  member of the International Association of Chiefs of
6  Police; is that correct?
7      A.  Associate member, yes.
8      Q.  But you were never a chief, correct?
9      A.  No, associate member you have to be
10 sponsored by a chief.
11     Q.  Have you ever spoken to Fred Inbau?
12     A.  Yes, I formerly served as a board member of
13 Americans For Effective Law Enforcement many years ago
14 so that's how I knew Prof. Inbau.
15     Q.  When is the last time you spoke to him?
16     A.  Oh, lord, it has been 30 years. He was
17 quite along in years. I don't know if he is still
18 alive.
19     Q.  Have you ever spoken to Gov. Dukakis?
20     A.  Not to Governor himself. I was
21 involved in a task force investigation some years ago
22 of training up there.
23     Q.  Who did you work with at the British Metro
24 Police in 1988?
25     A.  I don't recall who I -- they brought me

20

1  over there and I gave some lectures and spent some time
2  with different parts of their police structure. I
3  don't remember, it has been so many years.
4      Q.  Is there any place you could look at to
5  find out that information?
6      A.  I don't think so. There may be a Bobby's
7  hat in there.
8      Q.  Who did you work with at the New York
9  police department PBA?
10     A.  I don't remember the names of the PBA
11 officers that had me up there. I was consulting with
12 them on stress and crisis intervention in the police
13 department. I can't remember over so many years, just
14 to say that they were members of the PBA that brought
15 me up.
16     Q.  Your work with the NYPD PBA, did that have
17 anything to do with investigative procedures?
18     A.  No.
19     Q.  I'll tell you what, Doctor. Why don't you
20 open Kirkham 1 which is your CV.
21     A.  All right.
22     Q.  And pages 3 to 4.
23     A.  Right.
24     Q.  Really starting at the bottom with the
25 Detroit Police Officers Association about the fifth

**EXHIBIT 46**

21

1    entry from the bottom.
2       A.   From the bottom, okay.
3       Q.   Start on page 3, Doctor.
4       A.   I'm sorry, okay.
5       Q.   Go back one.
6       A.   Okay.
7       Q.   Detroit Police Officers Association.
8       A.   Right.
9       Q.   Running all the way down through the next
10   page which ends Hillsborough County Sheriff Police
11   Department.
12      A.   Right.
13      Q.   Could you tell me which of these
14   associations you had any involvement with police
15   investigative procedures?
16      A.   I don't think there are any of these.  They
17   were in connection with other matters other than police
18   investigation.  I don't think any of them had to do
19   with police investigation.
20      Q.   Okay, thank you, Doctor.
21      A.   Sure.
22      Q.   Who did you work with at the U.S. treasury
23   department?
24      A.   I worked with the consolidated federal law
25   enforcement training center which was located in

22

1    Washington at the time.  It is now in Glen Cove,
2    Georgia, but I don't remember the name of the person
3    who brought me up there to do training.
4       Q.   What year was that?
5       A.   That would have been somewhere back in
6    probably the early eighties.  I don't recall exactly.
7       Q.   Okay.  Who did you work with at the FBI?
8       A.   Again I was invited to come up to Quantico
9    and display a new series of training films I developed
10   under the U.S. Department of Justice grants, but I
11   don't remember who the contact person was.
12      Q.   Am I correct in understanding your CV that
13   you have performed consultant work for some police
14   departments and towns throughout the country?
15      A.   Yes, I have and I don't currently do that
16   type of work anymore but I have done extensive training
17   and consulting.
18      Q.   When was the last year you did that?
19      A.   I haven't done that probably for oh, gosh,
20   15 years or more now.
21      Q.   According to your CV, you've never acted as
22   a consultant for a New Jersey town or state police
23   department?
24      A.   I don't believe so.
25      Q.   And not a county police department in New

23

1    Jersey?
2       A.   I don't think so.
3       Q.   You don't think so or you didn't?
4       A.   I'm pretty sure I have never done.  50
5    states are hard to remember, but I'm sure it would be
6    listed in here if I had.
7       Q.   So if it is not on your CV, it didn't
8    happen?
9       A.   I don't think so.
10      Q.   Since 1991, what has been your occupation
11   other than the consulting work?
12      A.   Well, Professor emeritus, Florida State
13   University school of criminology and criminal justice
14   and a private criminal justice consultant.  I stand
15   semiretired now.
16      Q.   Are you still teaching at Florida State?
17      A.   No, no.
18      Q.   When did you retire?
19      A.   August of 1991.
20      Q.   So since August of 1991, you've been
21   consulting?
22      A.   Yes, that's correct.
23      Q.   Before you got your doctorate degree, you
24   were working in a prison, correct?
25      A.   I had worked in a prison, yes.

24

1       Q.   How many years did you work in a prison
2    for?
3       A.   Initially, I was a student professional
4    assistant at Soledad state prison, now Salinas Valley
5    state prison from 1964, the summer of '64 and then I
6    returned there.  I worked there two years while I was
7    finishing my masters degree.
8       Q.   And your bachelors and master's degree,
9    what was their concentration in?
10      A.   In the field of criminology.
11      Q.   Criminology?
12      A.   Yes.
13      Q.   Are you sure?
14      A.   Yes.  At the time it was specifically
15   criminology, it was corrections.  My degree says
16   emphasis corrections.  I was going into the penal
17   system.
18      Q.   Okay.  So it wasn't with an emphasis in
19   police investigations?
20      A.   No, no.
21      Q.   In your CV you list a two part video series
22   called Police Authority and Informal Discretion.  What
23   are those videos about?
24      A.   Basically, they are a series of vignettes
25   that show officers in different field situations,

**25**

1 predominantly patrol officers, some officers in other
2 capacities, off duty, for example, in which the officer
3 makes a proper or improper use of the exercise of
4 authority, his or her authority, and there is a
5 critique of it. There are role plays, there is a
6 manual that goes along with it. That was developed
7 under grants from the U.S. Department of Justice.
8    Q.   What years were those videos made?
9    A.   They came out in '76. You are talking
10 about Police and Human Dimension. There were eight of
11 them, I think.
12    Q.   You haven't received a research grant since
13 1979, correct?
14    A.   I have not applied for one, that's correct.
15    Q.   So you haven't received one?
16    A.   No, I have not applied for one.
17    Q.   Okay. When was the last time you applied
18 for one?
19    A.   It would have been somewhere back in the
20 seventies, mid seventies. I wound up using grant
21 monies that I had at the University that had been
22 sitting in the bank as it were, to develop the body
23 language series in the late eighties, '89 or so.
24    Q.   What year was your work as you describe it
25 in your CV the subject of a 60 Minutes segment?

**26**

1    A.   Boy, that's tough. I think somewhere in
2 the mid seventies. I'm not sure just when. Maybe late
3 seventies.
4    Q.   Okay. And you listed the Tomorrow Show on
5 NBC.
6    A.   Right.
7    Q.   Did you mean the Today Show?
8    A.   No, it was then called the Tomorrow Show.
9    Q.   Same question. What year was your work the
10 subject of the Tomorrow Show?
11    A.   I think that was back somewhere in the mid
12 seventies. Something like that.
13    Q.   For Good Morning, America, Newsweek, U.S.
14 News and World Report, People magazine and Reader's
15 Digest, is it fair to say your work was the subject of
16 all those particular media outlets in the 1970s?
17    A.   Right, the movement from professor to
18 policeman is mainly what they were focused on.
19    Q.   Nothing in the 1980s or nineties?
20    A.   No. I've done, I do interviews with MS-NBC
21 or Fox News, things like that, but sporadic.
22    Q.   But the ones you identified in the CV, you
23 are referring to the 1970s time period?
24    A.   Yes, those mostly surrounded the Professor
25 Policeman project.

**27**

1    Q.   So you have never received any formal
2 education on police investigative procedures; is that
3 correct?
4    A.   Only -- patrol officers are investigators
5 to a degree. Only in the course of the basic police
6 academy. There has been no formalized training in
7 police investigative procedures.
8    Q.   I'll tell you what, let me ask a different
9 question. When you obtained your bachelors, masters or
10 doctorate degree, none of those degrees involved
11 education in police investigative procedures?
12    A.   You are right.
13    Q.   And as for your experience, it is simply in
14 your training as a patrolman, right?
15    A.   As far as any training that I would have
16 had in investigative matters, yes.
17    Q.   Okay.
18    A.   In-service training or academy training.
19    Q.   Thank you, Doctor, you can put that one
20 aside. That wasn't painful.
21    A.   That's what a dentist says. My brother is
22 a dentist.
23        (Kirkham Exhibit 2, document entitled
24    "Rule 26b List for Dr. George Kirkham" was marked
25    for identification.)

**28**

1 BY MR. RAINONE:
2    Q.   Dr. Kirkham, we have placed in of you what
3 we marked as Kirkham Exhibit 2 which I will represent
4 is a rule 26b list for Dr. George Kirkham which I
5 received from Mr. Faugno and also from your website.
6 Would you take a look through that document and tell me
7 if you agree with my characterization of the document.
8    A.   Yes, that is exactly what it is.
9    Q.   And did you prepare this list?
10    A.   No, my associate, Prof. Pete Fanton,
11 prepared this.
12    Q.   Do you know when the last time it was
13 updated?
14    A.   It was just updated through '07 recently.
15 It looks like the updates are on here.
16    Q.   So is this a full and complete list of all
17 the cases you have testified in or been deposed in
18 since 2000?
19    A.   Well, it is also cases I have been retained
20 in and have done neither deposition nor trial. They
21 have settled or resolved, for example.
22    Q.   Okay.
23    A.   So it is with the caveat that we are now
24 sitting here in February and there are recent cases, a
25 few cases that have come in already this year that

**EXHIBIT 47**

45

1   other documents, no.
2       Q.   That's no?
3       A.   No.
4       Q.   All right.  Before you prepared this
5   report, who did you speak to?
6       A.   Mr. Faugno.
7       Q.   Did you speak with Mark Van?
8       A.   No, I've never spoken to Mr. Van.
9       Q.   You only spoke to Mr. Faugno?
10      A.   Yes.
11      Q.   Did you speak with anyone else?
12      A.   His secretary, mostly about the logistics
13  of the deposition.
14      Q.   Anyone else outside of Mr. Faugno's office
15  before you prepared this report, did you speak to them?
16      A.   No.
17      Q.   Did you go to New Jersey before you
18  prepared the report?
19      A.   No.
20      Q.   While you were preparing the report, did
21  you talk to Mark Van?
22      A.   No, I've never spoken to Mr. Van in my
23  life.  I don't know him.
24      Q.   Okay.  You said you prepared this report,
25  correct?

46

1       A.   Entirely by myself, yes.
2       Q.   You typed it where, on a computer?
3       A.   On my computer, correct.
4       Q.   The computer is in this house we are in
5   now?
6       A.   Yes, it is.
7       Q.   Are there drafts of this report before this
8   final one?
9       A.   No.  I mean, initially, I would go through
10  it, I would move things, add things.  This is the end
11  product.  This is all I save.
12      Q.   So there were drafts; is that correct?
13      A.   Well, drafts in the sense of you know, my
14  initial composition.  I don't remember which paragraphs
15  I changed or which things I might have added to or
16  moved around.  That's the way one prepares something
17  like this, but I don't think of it as drafts.
18      Q.   When you were working on the report, was
19  there any information you deleted from the final report
20  before you sent it out?
21      A.   No.  I mean, I edited.  Without any input,
22  I might add, from Mr. Faugno or anyone else.  As I sit
23  at my machine, my computer working on this, I'm sure
24  there are sentences that have been changed.
25      Q.   Okay.

47

1       A.   You know, there may be things that are
2   italicized.  I don't remember what I did in terms of
3   the process of putting this together.
4       Q.   Okay.  So you don't have the drafts of the
5   report?
6       A.   No, no.
7       Q.   Okay.  Do you have any notes, handwritten
8   notes when you were reviewing the 28 items?
9       A.   No.  See, my style of note taking is to
10  highlight, I italicize, I dog ear.  Sometimes I make a
11  parenthetic marginal note, but that is my style of note
12  taking.
13      Q.   Okay, so this Redweld which we will mark we
14  will call Kirkham 4, this is your complete file in this
15  matter which we will have copied and I'll take a copy.
16      A.   That's correct.
17      Q.   And that's everything, no notes or drafts
18  anywhere else?
19      A.   No.  I assume the court reporter takes
20  that, he will get it back to me.
21      Q.   Right.  So the only person you spoke to in
22  preparing this report was Mr. Faugno, correct?
23      A.   Correct.
24          (Kirkham Exhibit 4, Dr. Kirkham's file, was
25          marked for identification.)

48

1   BY MR. RAINONE:
2       Q.   On items 1 through 28, there are items 21
3   through 27 are depositions of seven witnesses.  Did you
4   read all seven depositions?
5       A.   Very carefully.  Some of them more than
6   once, yes.
7       Q.   Let's go to paragraph 1 of the report,
8   Doctor.
9       A.   All right.
10      Q.   In paragraph 1, this is Kirkham 3, you use
11  the term "extremely serious violations."  I would like
12  you to define for me what "extremely serious" means in
13  your mind.
14      A.   Egregious, outrageous, beyond the pale of
15  anything remotely acceptable in the field of law
16  enforcement.  I am not given to hyperbole, but those
17  are terms that are used to accentuate the seriousness
18  of the situation.
19      Q.   You said, "outside the realm of anything
20  acceptable in law enforcement"; is that correct?
21      A.   Violations of specific police investigative
22  procedures is what I am talking about specifically.
23      Q.   Okay.  What specific police investigative
24  procedure did you base this statement on, this
25  "extremely serious violations"?

**49**

1    A.   It is based on my familiarity and I would
2 be glad to give you some exemplars off the top of my
3 head.  My familiarity with an extensive body of
4 publications -- books, articles, monographs -- on
5 proper investigative procedures, police investigative
6 procedures involving specifically police personnel who
7 allegedly had been involved in some form of misconduct.
8 The backdrop of my familiarity with the relevant body
9 of professional literature that is utilized in my
10 experience throughout the United States in law
11 enforcement agencies -- federal, state and local.
12    Q.   Could you point out to me in items 1
13 through 28 where those specific books and reference
14 materials are?
15    A.   Well, they are not chronicled in here.
16 They are not things that I -- I did not go back.
17         MR. FAUGNO:  I object.  He didn't say he
18 reviewed them.
19         MR. RAINONE:  He said that's what they were
20 based on.
21         MR. FAUGNO:  That doesn't mean he reviewed
22 them for this case.
23         THE WITNESS:  It is predicated on my
24 longstanding familiarity with these documents.
25 Thought I did not for purposes of this case ad hoc

**50**

1 go back and begin reviewing specific documents is
2 what I am saying.
3 BY MR. RAINONE:
4    Q.   I'll tell you what.  Give me the list now.
5    A.   Not having a photographic memory, I would
6 be glad to give you some prominent exemplars off the
7 top of my head.
8    Q.   No, I would like to know the list you
9 relied on in making the statement that based on the
10 documents 1 through 28 that you looked at disclosed
11 extremely serious violations by the defendants of
12 well-established law enforcement investigative
13 standards and procedures.  I want to know what specific
14 reference materials you were describing that your
15 general backdrop you have knowledge of.
16    A.   You are asking for two different things.
17    Q.   No.  If you don't understand the question,
18 tell me.
19    A.   Well, I don't understand the question.  By
20 way of clarity, are you asking me what specific -- I
21 think I just answered this.  What specific documents,
22 professional standards documents, I reviewed?  Or are
23 you asking me did I rely on general law enforcement
24 literature that would contain some specifics?  But I
25 didn't do a literature search for purpose of this case.

**51**

1 I didn't feel a need to do it.  These things I am
2 familiar with, I have been for many years.
3    Q.   I'll tell you what:  The well-established
4 law enforcement investigative standards and procedures.
5    A.   Okay.
6    Q.   What standards and procedures are you
7 referring to?
8    A.   I'm talking about standards that relate to
9 police investigative procedures and those particularly
10 that pertain to alleged criminal and/or administrative
11 violations by a law enforcement officer.  Those things
12 are dealt with in countless texts, periodicals.  I'll
13 be glad to give you examples.  You can look at them.
14    Q.   Give me a list.
15    A.   Again, you're asking for a list, counsel,
16 and I'm speaking off the top of my head in terms of
17 memory against a huge body of literature, but I'll be
18 glad to give you some prominent exemplars.
19    Q.   I would like for you to give me what you
20 are referring to in paragraph 1.  You wrote a report,
21 "Well-Established Law Enforcement Investigative
22 Standards and Procedures."  Yes or no, you can give me
23 the list of the procedures and standards you are
24 referring to in paragraph 1?
25    A.   "List" implies comprehensive.

**52**

1    Q.   It's a simple question.  Can you give me
2 the list?
3         MR. FAUGNO:  You are being argumentative.
4         MR. RAINONE:  I would like an answer to my
5 question.
6         THE WITNESS:  No, I cannot give you a list
7 of all relevant documents, periodicals, textbooks,
8 articles that are published in the United States of
9 America.  It is extensive.  It will fill shelf
10 after shelf.  I cannot give list all those
11 documents.
12 BY MR. RAINONE:
13    Q.   That is not what I am asking.  I'll give
14 you an example?  If I wanted to -- as a lawyer, if I
15 want to know what the rules are in the federal court, I
16 go and look at the Federal Rules of Civil Procedure.
17 So you have written a report about violations of
18 well-established law enforcement investigative
19 standards and procedures.  How do I -- I'm not a police
20 officer, I've never been a police officer.  How do I go
21 find out where these standards and procedures are?
22    A.   You ask the deponent expert, I think, could
23 I have some sources?  Could I have some examples of the
24 types of material you predicated your report on?  When
25 you speak of violations of well-established