**EXHIBIT 48**

Page 53

1  investigative standards, give me some examples of what
2  those are. That I can do. I can't give you an
3  exhaustive list.
4      Q.  I don't want an exhaustive list. I'll tell
5  you what. What do you have on your bookshelf in your
6  office?
7      MR. FAUGNO: Why don't you let him give
8  them to you?
9      MR. RAINONE: Paul, could you let him
10 answer the question.
11     MR. FAUGNO: Because you're being
12 argumentative in your questions.
13     THE WITNESS: Prof. Fenton keeps my
14 library, all materials that relate to police and
15 crime prevention matters in Atlanta. If you want
16 my library, your going to find Freud and Plato and
17 things like that.
18     Q.  Okay.
19     A.  So I'll be glad to give you examples, if
20 you like.
21     Q.  Please give me an example now.
22     A.  All right, let me see. Some good textual
23 material, one of the most prominent and widely used
24 sources I have just finished a book with this
25 gentleman, I mentioned Dr. Leonard Territo, Territo,

Page 54

1  Swanson and Taylor, Police Administration.
2      Q.  Those are three authors of the same book?
3      A.  Yes.
4      Q.  Territo, Swanson and Taylor?
5      A.  Right. Police Administration.
6      Q.  Police Administration?
7      A.  Prominent text used throughout the United
8  States for many years. I don't know what edition it is
9  in now but, it well antedates this occurrence.
10     Q.  Okay.
11     A.  That would be one. Another one, Lou
12 Reiter, R-e-i-t-e-r, former deputy chief of police in
13 Los Angeles, I believe. Don't hold me to the exact
14 title. You'll be able to Google it and find it easily
15 enough, I think. It is Police Internal Investigations,
16 Manual, Police Internal Investigations, Policeman's
17 Conduct, one or all of those titles are subsumed in the
18 title of this work. Also a premiere law enforcement
19 organization in the United States, the International
20 Association of Chiefs of Police, IACP, I'm sure the
21 chief of this department is probably a member. That,
22 you go to their model cities standards called Model
23 Cities Standards For Internal Investigations, Officer
24 Misconduct Investigations. And those sources should
25 enable you to, per your analogy of Federal Rules,

Page 55

1  should enable you to bootstrap into any number of other
2  sources of literature all of which bear on this
3  statement.
4      Q.  Okay. Doctor, is it fair to say that when
5  you prepared this report, you didn't review any
6  specific book on these well-established law enforcement
7  investigative standards and procedures?
8      A.  No, I said I didn't feel a need to conduct
9  a literature search. I know them.
10     Q.  So you didn't look at them?
11     A.  No.
12     Q.  Okay, thank you. Did you look at any
13 investigative procedure materials specific to the state
14 of New Jersey?
15     A.  No, other than Mr. Faugno showed me last
16 evening, we had a meeting last evening, he showed me
17 the penal code for the state of New Jersey and portions
18 of that. Again, I'm not a lawyer. I don't profess any
19 legal expertise, but in police investigation anywhere
20 it would have obvious applicability.
21     Q.  But you didn't look at this penal code
22 before you made this report?
23     A.  No, I didn't feel a need to.
24     Q.  Did you look at the New Jersey Attorney
25 General guidelines?

Page 56

1      A.  No.
2      Q.  Did you look at the North Haledon
3  departmental rules and regulations?
4      A.  No.
5      Q.  When you looked at the penal code last
6  night, did you see anything that changed your opinion
7  in this report?
8      A.  No, other than again, this is a report
9  rendered as a criminologist, not a lawyer.
10     Q.  I understand that.
11     A.  But I do appreciate in the wake of
12 reviewing the New Jersey penal code the classification
13 of somewhat what was going on obviously falls within
14 the purview of criminal conduct and it makes it -- I
15 mean obviously there were -- there was evidence that
16 there were criminal allegations involved, but the
17 magnitude of withholding evidence or obstructing of
18 official police investigation being a second degree
19 felony in the state of New Jersey, I had no prior
20 knowledge of that.
21     MR. FAUGNO: That is the official
22 misconduct statute. Mr. Centrello and Walsh should
23 read it.
24     MR. RAINONE: Come on.
25     MR. FAUGNO: I'm just saying they should

**EXHIBIT 49**

Page 57

  1    read it. I'm pretty familiar with it.
  2    BY MR. RAINONE:
  3        Q.  In the penal code you looked at last night,
  4    did it provide any information on how to conduct a
  5    criminal investigation in New Jersey?
  6        A.  No, I don't think it contained any
  7    procedural information.
  8        Q.  Thank you, Doctor. All right, let's go to
  9    paragraph 2 of your report.
 10        A.  Okay.
 11        Q.  Again, you use the phrase, "standards of
 12    the police profession." Are you again referring to
 13    sources you didn't look at for this report, but that
 14    you have general knowledge of?
 15        A.  That's correct.
 16        Q.  Okay. And you gave me a list of three or
 17    four sources. Would you be able to give me a complete
 18    list of all those sources?
 19        A.  I mean, you want all publications in the
 20    United States of America that have bearing on police
 21    investigative procedures? Is that what you're saying?
 22    I would just say that it is frankly onerous. From
 23    those, sources off the top of my head, you ought to be
 24    able to get to anything you need to look at.
 25        Q.  All right. Now, you state in paragraph 2,

Page 58

  1    "Any allegation of criminal misconduct on the part of a
  2    law enforcement officer is an extremely serious
  3    matter." I want you to define what "extremely serious"
  4    is.
  5        A.  I don't know. Frankly, with all due
  6    respect, do you need a criminologist to tell that you
  7    an allegation of a police officer committing a crime is
  8    serious?
  9        Q.  I'm asking you, Doctor.
 10        A.  Yes, it is serious. Serious, grave,
 11    damaging to the police profession, to the officer
 12    himself. It is extremely serious.
 13        Q.  So something should be done, some
 14    investigation should happen, correct?
 15        A.  Absolutely.
 16        Q.  Okay.
 17        A.  It cannot be ignored or set to one side.
 18        Q.  Thank you. Now, in paragraph 2 you have,
 19    "Standards of the police profession require that an
 20    accusation against a police officer be internally
 21    investigated" and you use the word "internally" and
 22    that he's what I want to focus on.
 23        A.  Yes.
 24        Q.  Why do you say that in this case?
 25        A.  Well, the fact that Officer Van was at the

Page 59

  1    time no longer a Haledon police officer might mean the
  2    chief would have the option of approaching it a couple
  3    of ways. He could use, being a small agency, he could
  4    use someone from his IA unit, I think the officer that
  5    he picked, Parenta, had personnel matters. He had done
  6    hiring and background checks on people. He could use
  7    someone like that. He could use someone from IA, he
  8    could use someone from his CID, criminal investigation
  9    division. It doesn't really matter who conducts it so
 10    long as they are competent. So even if you delete the
 11    word "internal" it is obviously a matter that is of
 12    internal concern because it involves their equipment,
 13    their badge, their ID card. The operative words are
 14    that they be "promptly, thoroughly, confidentially and
 15    timely investigated."
 16        Q.  But you don't mean by this statement that
 17    it should be an internal affairs investigation, do you?
 18        A.  It doesn't have to be an internal affairs
 19    investigation.
 20        Q.  Would you be able in your experience to
 21    have an internal affairs investigation of an officer
 22    who is not a member of your department?
 23        A.  No, you really couldn't do that. The thing
 24    that makes it a little bit murky is this involved that
 25    agency's equipment. It involved identification,

Page 60

  1    alleged misidentification through use of their
  2    equipment. So it is really discretionary on the part
  3    of the chief how he wants to proceed as far as do I
  4    want to do this -- normally, internal affairs works
  5    directly under the chief. Do I want to use an IA
  6    investigator? Do I want to use someone from my CID?
  7    That really isn't important. It is how competently,
  8    timely, confidentially and so forth it is handled.
  9        Q.  Based on your experience, in the realm of
 10    possible choices a chief could make in this situation
 11    in your experience, is one of them sending a police
 12    officer or two to ask of this subject did he have the
 13    badge?
 14        A.  Well, that would be an absurd investigative
 15    procedure. There are many absurd investigative
 16    procedures followed here, but it would make no sense to
 17    do something like that. The first thing -- you do two
 18    things. You consider first, when anyone comes forward
 19    with a criminal allegation, it doesn't matter if it is
 20    involving a domestic disturbance or theft or whatever,
 21    the first thing any competent officer or administrator
 22    asks is you consider the source, the motivation of the
 23    person coming forward with this information.
 24            And then what do you do at first? The
 25    first thing you do is look for the body, look for the

**Page 61**

1  stolen car, find out if the crime actually occurred.
2  We get false reports that come into police agencies all
3  the time and in Florida giving false information to a
4  police officer is a crime. I'm sure it probably is in
5  New Jersey as well.
6      so first thing you do, you do ironically
7  what Chief Moppert from Harrington Park did later on
8  ultimately, which is contact NYPD, contact the China
9  Club and see if anything like that ever happened.
10 That's the first thing you do. And you also would
11 consider when a complainant comes forward you, consider
12 in terms of assessing their veracity, setting aside the
13 fact that there was apparently bad blood between
14 Sergeant Rowe and Mr. Van which the chief was aware of,
15 you have some concern about that, but you would -- the
16 red light, the red light that goes off and the bells
17 that clang are once this officer, this sergeant comes
18 forward with a grave allegation involving a former
19 member of this agency and another police officer, when
20 he tells you I can't provide you, I won't provide you
21 with the name of the officer who gave me this
22 information. The response to that is yes you will, or
23 you will be up on administrative charges. You will
24 tell me right now in standard who that is. You have no
25 immunity that way. And the chief acquiesced. He said

**Page 62**

1  hey, my hands were tied. He didn't want to tell me.
2  What could I do? I just about fell out of my chair
3  when I read that.
4      Q. I'll tell you what, Doctor. Yes or no, you
5  consider it absurd for the chief to have an officer ask
6  a suspect if he in fact committed a crime?
7      A. I consider it --
8      Q. Yes or no. That's an easy question. Yes
9  or no. You consider it an absurd investigative
10 procedure for the chief to ask one or two police
11 officers of his to ask a suspect if he committed a
12 crime?
13     A. I have to ask a pointed question first.
14 Are you asking me generic question like a street
15 criminal or are you asking me about the context of this
16 case?
17     Q. I'm asking you. We can go back to your
18 testimony. I'm asking because when we got to the
19 situation --
20     MR. FAUGNO: That is a fair qualification.
21 BY MR. RAINONE:
22     Q. We can go back and read the question. When
23 I asked you whether in the realm of possible responses
24 whether, Chief Ferrante sending one or two police
25 officers to ask a suspect if he committed a crime, you

**Page 63**

1  called it an absurd investigative procedure. So that
2  is my question. Yes or no. Do you consider it an
3  absurd investigative procedure for the chief of police
4  when he gets a tip that a former police officer
5  committed a crime to have one or two of his officers go
6  and ask that officer if he committed the crime?
7      MR. FAUGNO: I object to that question.
8  BY MR. RAINONE:
9      Q. Did you understand the question?
10     MR. FAUGNO: Let me put my objection on the
11 record.
12     MR. RAINONE: We will put him out of the
13 room. Do you want to put him out of the room?
14     MR. FAUGNO: You switched in the question
15 from a specific to a general again. Ask him
16 whether Ferrante doing it in this case was absurd,
17 yes or no? Then he can answer it. That's my
18 objection, go ahead.
19 BY MR. RAINONE:
20     Q. Yes or no to the question, Doctor.
21     A. Again, I want to be responsive to your
22 questions. Are you asking me specifically about the
23 conduct of Chief Ferrante vis-a-vis Officer Van or are
24 you asking about some just global question about an
25 investigation of anybody, period.

**Page 64**

1      Q. I'm asking you as a self-declared
2  specialist in police investigative procedures, a chief
3  of police gets a tip that a former police officer
4  committed a crime, do you think it is an absurd
5  investigative procedure for that chief of police to
6  send his officer or two officers to ask that suspect if
7  in fact he committed the crime?
8      A. Yes, without taking other basic
9  investigative steps.
10     Q. That's fine. Thank you, Doctor. You don't
11 disagree in this case -- strike that. Yes or no, Chief
12 Ferrante did get information that someone identified
13 themselves as Mark Van in New York City with a badge?
14     A. Highly suspect information, yes.
15     Q. That is not the answer. Yes or no. Strike
16 that. Tell you what: Do you believe Chief Ferrante
17 that he got the information?
18     A. I believe that there came a point in
19 time -- I have to take it as a hypothetical. I'm not
20 the trier of fact. I take it as a hypothetical that
21 there came a period of time when another officer,
22 Sergeant Rowe, came into his office and said hey,
23 Chief, this is what I know and told him about these
24 allegations.
25     Q. So you don't disagree that Chief Ferrante

**EXHIBIT 50**

Page 65

1 got information that someone flashed a badge in New
2 York City and identified themselves as Mark Van?
3    A.   Again, I have to take that as a
4 hypothetical. I wasn't in that office. I'm
5 assuming -- taking it as a hypothetical, I'm assuming
6 that occurred.
7    Q.   Did you read Chief Ferrante's testimony?
8    A.   I did.
9        MR. FAUGNO: Anthony, he's not a finder of
10   fact.
11       MR. RAINONE: I understand that. This is
12   what his opinion is based on.
13 BY MR. RAINONE:
14   Q.   You read Chief Ferrante's deposition,
15 correct?
16   A.   Correct.
17   Q.   Do you have any reason to believe based on
18 your reading of that deposition that he did not receive
19 that information?
20   A.   Quite frankly, I don't want to get involved
21 and duel over this thing. I don't know whether this
22 was something that was later retrospectively fabricated
23 given the context. I don't know. I have to take this
24 as a hypothetical, assuming that happened.
25   Q.   That's what I am asking.

Page 66

1    A.   Assuming that happened. I assume as a
2 hypothetical that Sergeant Rowe came into the chief's
3 office and relied what is in the record to him.
4    Q.   In paragraph 2, you italicize the phrase
5 "promptly, thoroughly, confidentially and in a timely
6 manner." What sort of time line would you consider
7 prompt when a chief receives allegations that someone
8 flashed a badge from his department?
9    A.   There is no calculus. I don't think it is
10 fair to straitjacket an agency by saying you must do it
11 within 15 minutes, within a day, but you need to get on
12 it. And also something else that obviously is implicit
13 in this is that you open a file obviously and you
14 record, you start making notes. You assign a case
15 number, you start making notes on it.
16   Q.   So you don't know what time period would be
17 prompt?
18   A.   Certainly something less than waiting until
19 counsel writes a letter, Mr. Van's counsel writes a
20 letter and then creating a file and a record a long
21 time afterward.
22       (A recess was taken.)
23 BY MR. RAINONE:
24   Q.   Dr. Kirkham, these professional standards
25 in paragraph 2, these are again nothing specific to New

Page 67

1 Jersey, correct?
2    A.   Well, in my experience, they are followed
3 throughout the United States and all states in the
4 conduct of police investigations. I can't speak
5 specifically to New Jersey.
6    Q.   So you don't know whether New Jersey has
7 any particular police regulations requiring a detailed
8 written investigative record be maintained from the
9 inception of a complaint, correct?
10   A.   I have no specific knowledge of any
11 particular New Jersey requirement but again, I've had
12 police cases, numbers of them in New Jersey over the
13 years as all the other states in my experience.
14   Q.   Have you ever had any police investigative
15 procedures cases in New Jersey?
16   A.   Again, I think we covered that earlier. I
17 don't know. I can't recall.
18   Q.   You can't recall?
19   A.   But I've had a number of New Jersey cases.
20   Q.   Okay. And you can't tell me the time
21 period for a prompt, thorough investigation, can you?
22   A.   I don't think it's fair to put tight time
23 strictures other than to say that a reasonable time
24 certainly would not be the amount of time that elapses
25 before a record is created on this.

Page 68

1    Q.   Is one to two weeks too long?
2    A.   It would depend upon the workload of the
3 department. I would think this is a matter so grave
4 that within a few days you should just move on it
5 straight away. It is very simple to resolve.
6    Q.   Would commencing the investigation within
7 24 to 48 hours of receiving the information be prompt
8 enough for you?
9    A.   I think that would be reasonable, yes, or
10 72 hours.
11   Q.   Okay.
12   A.   You want to move on it, you know.
13   Q.   And did you in writing this report do any
14 analysis of the workload of the North Haledon police
15 department?
16   A.   No, I did not.
17   Q.   Thank you, Doctor. And what would be
18 included in a detailed written investigative record?
19   A.   Well, the first thing and this you will
20 find in any investigative text in the United States,
21 the first thing that happens with something like this
22 because it is an allegation of serious criminality
23 involving a police officer, the first thing that
24 happens is this is memorialized in the form of a file
25 is opened, a case number would be assigned to it, a

69

1  detective would be assigned to it and that person would
2  begin making notes immediately. The chief would make
3  notes from his initial conversation.
4         I think I have told you that that initial
5  interview or that contact with Sergeant Rowe would
6  involve a requirement stated to him that he must now
7  disclose the name of his informant, his police
8  informant, because otherwise he is in peril. He is
9  obstructing an official police investigation and
10 possibly violating criminal laws of the state of New
11 Jersey right away.
12    Q. Doctor, would a police investigative report
13 include who the information came from?
14    A. Yes, it would.
15    Q. Would it include the police officer
16 investigating it?
17    A. Yes, it would include -- it would identify
18 the officer conducting the investigation. The chief as
19 the initial recipient.
20    Q. Okay. Would it include the steps the
21 officer took during the investigation?
22    A. Absolutely.
23    Q. And would it include what the officer
24 concluded at the end of the investigation?
25    A. You are talking about once it is all done?

70

1  Once the whole thing has been concluded?
2     Q. Yes.
3     A. Yes, there would be a summary and
4  conclusions and possible referral to a prosecuting
5  agency. Whatever seems to be appropriate.
6     Q. Okay. Thank you, Doctor. And just so I am
7  clear in your testimony earlier, you agree that Chief
8  Ferrante didn't have to do an internal investigation,
9  like an internal affairs investigation?
10    A. That's true. I think I said earlier, it
11 could be done by CID, it could be done internally.
12 There are a number of people he could use. It is a
13 small agency.
14    Q. Have you ever heard of doing an internal
15 affairs investigation on a police officer that is not
16 in your agency?
17    A. No, that probably fairly would result in
18 going another route that way.
19    Q. Let's go to paragraph 3, Doctor.
20    A. All right.
21    Q. Okay. In paragraph 3, you state, "It is
22 readily apparent that the investigation of the alleged
23 criminal misconduct was grossly negligent and
24 incompetent." Correct, Doctor?
25    A. Yes.

71

1     Q. And just so I am clear, you said before you
2  are not a lawyer, correct?
3     A. I am not a lawyer, that's correct.
4     Q. So why don't you tell me the facts you are
5  basing that statement on, that it was readily apparent
6  that the investigation was grossly negligent and
7  incompetent.
8     A. If we kind of keep those words in our mind,
9  "grossly negligent and incompetent," I am using it as a
10 criminologist, the initial point for making those
11 comments have to do from the very inception with the
12 behavior of the chief upon receiving this information
13 from Sergeant Rowe, that he does not first, as I just
14 said and I'll reiterate, tell that sergeant that he
15 must provide, he may not withhold, he has come forward
16 with a serious criminal allegation, felonious conduct
17 by a police officer, and he may not withhold that
18 information. I want you to tell me now, right now or I
19 will suspend you, and you face possible prosecution for
20 obstructing an investigation, a criminal investigation.
21 The failure of the chief to even fire a shot across the
22 bow of Sergeant Rowe, not even telling him that, but
23 simply saying as he mentions in the later report or
24 deposition I should say, that my hands were tied, there
25 is nothing I could do. Well, that's bull.

72

1     Q. Okay. You've never been a chief, right,
2  Doctor?
3     A. No, but I'm familiar --
4     Q. That is a yes or no question.
5     A. No, I've never been a chief.
6     Q. Yes or no, you have never had any training
7  on being a chief, correct, Doctor?
8     A. Correct also.
9     Q. Okay. So essentially, you think the chief
10 should have suspected Sergeant Rowe was not telling him
11 the truth; is that your opinion, Doctor?
12    A. You would have an immediate concern.
13    Q. I'm asking whether it was your opinion.
14    A. Yes, you would have a suspicion knowing
15 that there was friction between those two officers, you
16 would still give him the benefit of the doubt and say
17 well fine, just tell me the name of the person who told
18 you.
19    Q. So your opinion is based upon what you just
20 described, Chief Ferrante's knowledge of the relation
21 between Sergeant Rowe and Van. Is there anything else
22 that that opinion is based on?
23    A. We are walking our way through it. I'm
24 trying to give it to you step by step.
25    Q. Please.

Page 73

1  A. The failure to challenge or inform or
2  instruct the officer, the sergeant who is a supervisor,
3  by the way, that he may not withhold this information
4  is grossly negligent. I go back to my previous
5  verbiage here of grossly negligent and incompetent.
6  That is grossly negligent and incompetent. Going on
7  from that, the failure to record, to memorialize what
8  has just happened in that office as serious as it is,
9  the chief produces no notes, opens no file, creates no
10 record and this is a very grave matter. That also is
11 incompetent.
12      And then by way of following the tack of
13 grossly negligent and incompetent and this is frankly
14 mind boggling, to do the next thing he does which is
15 to -- it was fine to assign a detective to the case.
16 His selection, fine. But to then have that detective
17 and a uniformed supervisor go down some ways away
18 apparently to another police agency without doing the
19 first, I mentioned to you earlier and I represent to
20 you that this is a standard of police investigative
21 procedure you will find in texts and monographs and
22 articles all over the country.
23      The first thing you want to find out
24 because we frequently receive false information, did
25 the crime occur? Is there some basis for this

Page 74

1  allegation? And that involves contacting the NYPD,
2  contacting the China Club and following the trail of
3  all the principals, the police principals that are
4  involved in this thing and you would quickly have found
5  out of course through the least of these things what
6  Chief Moppert of Harrington Park later discovers. This
7  is purely bogus. Nothing like this ever happened.
8      Q. Doctor, in your 30 years, have you ever
9  dealt with security at night clubs?
10     A. Yes, I have had occasion to deal with cases
11 involving security at night clubs.
12     Q. Let me ask a different question. In your
13 30 years of experience, have you ever worked at a night
14 club?
15     A. No.
16     Q. Have you ever provided consulting services
17 for a night club?
18     A. No.
19     Q. Hypothetically, Doctor, if a chief of
20 police receives a tip that a crime has been committed,
21 do you find anything out of the ordinary for him to
22 send a uniformed cop to conduct an investigation?
23     A. In this context, absolutely. In the
24 context -- are we talking about this case?
25     Q. No, hypothetically. Just a chief of police

Page 75

1  gets a tip that a crime has been committed, do you find
2  anything out of the ordinary about him sending a
3  uniformed cop to conduct an investigation?
4      A. Well, taking this question generically,
5  nothing to do with the case, it is unusual. This is an
6  investigative matter. Normally those are handled by
7  plainclothes officers. We do not normally assign it
8  to -- I don't know what Lieutenant Darby's assignment
9  was at the time but he is a uniformed officer, it would
10 be very unusual to assign it to a uniformed officer.
11     Q. Are you aware of whether or not North
12 Haledon had uniformed and plainclothes officers in
13 2004?
14     A. Well, I can only operate with the record
15 that I have and it indicates that Detective Ferrante I
16 believe says he was in plainclothes and Lieutenant
17 Darby who accompanied him for reasons that are not
18 clear was in uniform, so they must have had some people
19 who were in uniform and some people who were in
20 plainclothes. That's true of almost all police
21 agencies.
22     Q. I'm just trying to understand in the
23 generic situation, hypothetical. You are of the
24 opinion that it is not okay for a chief of police to
25 send a uniformed police officer to investigate a crime?

Page 76

1      A. He certainly could. Let's be fair here.
2  He certainly could. He certainly could. Let's say for
3  whatever reason, he doesn't want to use a detective on
4  this case, he wants to call in this lieutenant for
5  whatever reason. Lieutenant, I have a serious
6  allegation here, here is the record, here is the case
7  number, so on. I want you to handle this. He could do
8  that, sure.
9      Q. So is it fair to say it is one option he
10 had?
11     A. To have a lieutenant handle the thing
12 properly, yes, but properly does not involve going out
13 to this guy's agency as opposed to short circuiting the
14 investigation by doing other things that should have
15 been done.
16     Q. Okay. Just so I am clear, Doctor, in the
17 hypothetical again where a police chief gets a tip that
18 a crime has been committed, you don't think it is okay
19 for him to send an officer in uniform to go in and ask
20 the person if they committed the crime? A hypothetical
21 question.
22     A. Is this pertaining to investigating a
23 police officer?
24     Q. No, just a hypothetical.
25     A. Dog bite case, something like that, yes.

**EXHIBIT 51**

22 (Pages 85 to 88)

### Page 85

1. wanted it handled discreetly, under no circumstances
2. could having two officers go talk to him be discreet?
3.    A.  You guys would call it res ipsa loquitur.
4. I think it speaks for itself.
5.    Q.  This is a yes or no question.
6.    A.  No, I think there is no reasonable police
7. reason to send two police officers down to this man's
8. department where he is working on duty to confront him
9. other than to embarrass, harass, intimidate him in a
10. malicious manner. That is totally improper.
11.    Q.  You agree that Mark Van hadn't worked for
12. North Haledon in four years at the time they got the
13. allegation, correct?
14.    A.  That's correct.
15.    Q.  Do you know who Draco is?
16.    A.  Yes, Draco was, if my history serves me --
17.    MR. FAUGNO: You don't have to answer that.
18.    THE WITNESS: I do know who it was. Head
19. of Sparta. Very severe kind of guy.
20. BY MR. RAINONE:
21.    Q.  Let me ask you a hypothetical, Doctor.
22. Under what circumstances would it have been acceptable
23. for Chief Ferrante to send one or two cops to go talk
24. to Mark Van about this allegation at the night club?
25.    A.  Okay, let's play with that for a moment.

### Page 86

1. Under the following circumstances, he could not despite
2. repeated efforts in this hypothetical, he could not
3. finds anyone. NYPD had had a flash fire in their
4. records, computers and hard drives had crashed. No
5. records available despite normal redundancy they have.
6. No records, we can't answer your question about what
7. happened in the China Club. China Club had gone out of
8. business. There was nobody there that was around
9. during that period of time, couldn't find out anything
10. at all about that. And Sergeant Rowe, the chief had,
11. discharging his duty, his buck stops here duty as a
12. chief of police, the head administrator, he had put the
13. screws on Sergeant Rowe to give him, if you will
14. specifically administrative criminal matter, very
15. serious nature. I want those names. He coughs up
16. Centrello's name, but he can't find any of these
17. people. He can't find Centrello or Dumont, he is off
18. somewhere or other, he can't do any of these lesser
19. things at all. Can't find Officer Lanari whose name
20. hasn't surfaced. So you can't get any more
21. information. The only way as chief here, the only way
22. I could learn what happened, the way I could clear this
23. thing up is I've got to talk to this guy.
24.    But then how would he do that? He would
25. do that by reaching out to him in a discreet way. He

### Page 87

1. would call, I would like to meet you. We are trying to
2. clear something up, can we stop by your house? Take an
3. unmarked car, I bet you they've got an unmarked car.
4. In plainclothes and you talk to the guy. You call him
5. up on the phone prior to that. Chief, apparently all
6. the chief wants here is a denial and he gets that and
7. then the whole thing is dropped at least until counsel
8. comes on board and then we create a file
9. retrospectively. That would be the circumstance under
10. which they could go down, but again, the idea of
11. rolling into a police -- cops are very observant, what
12. is North Haledon doing down here?
13.    Q.  So that's what you would have done as
14. chief?
15.    A.  If you couldn't do any of these other
16. things, all these avenues that normally would be
17. followed and you would be creating a paper trail of
18. everything you tried to do from square one on, Parenta
19. has no notes, had no notes at all which I've never
20. heard of a detective doing in an investigation.
21.    Q.  You've never been a chief before, correct?
22.    A.  No, sir.
23.    Q.  In your 30 years of consulting on cases,
24. have you ever heard of two cops questioning a suspect
25. about a crime?

### Page 88

1.    A.  Sure.
2.    Q.  Okay. That's easy. Yes or no?
3.    A.  Sure, of course.
4.    Q.  You don't have a problem in that situation?
5.    A.  No, some detectives work with partners.
6.    Q.  Okay, thank you, Doctor. You would agree
7. that a chief has the discretion as to how many cops to
8. send to interview a witness, correct?
9.    A.  He could. A chief could send, if you've
10. got an armed fugitive or something, you're going to
11. have plenty of people out there.
12.    Q.  It is a discretionary call, correct?
13.    A.  Sure.
14.    Q.  And the same would apply to a suspect. It
15. is a discretionary call as to how many cops would go
16. according to the chief?
17.    A.  That would mainly be tied to safety and
18. skills, special skills. It wouldn't have to do with a
19. police officer.
20.    Q.  But it is still a discretionary call?
21.    A.  Sure. Yes, you can use your resources that
22. way.
23.    Q.  Let's go to paragraph 6 of your report,
24. Doctor.
25.    A.  Yes.