**EXHIBIT 33**

1    A        I'm sorry.

2    Q        Forget who is sitting here.  Have

3  you ever had an encounter with any person outside

4  the China Club or inside the China Club who held

5  themselves out as being a person by the name of

6  Mark Van?

7    A        No.

8    Q        Have you ever had an encounter

9  anywhere in your career as a police officer with

10 the person sitting here to my left?

11   A        No.

12   Q        Have you ever seen this person

13 before sitting to my left?

14   A        Nope.

15   Q        In your career as a police

16 officer, has anyone to your recollection ever

17 shown you a badge identifying himself as a Mark

18 Van?

19   A        Not to my knowledge, no.

20   Q        Did you ever tell John Centrello

21 that you had an encounter with someone

22 identifying themselves as a Mark Van outside the

23 China Club?

24   A        No.

25   Q        Did you ever tell Officer John

**EXHIBIT 34**

1    Centrello that you had arrested someone by the

2    name of Mark Van or who identified themselves as

3    Mark Van outside the China Club?

4         A        No.

5         Q        Did you ever tell Officer

6    Centrello that you had arrested and then

7    unarrested a person who identified himself as

8    Mark Van outside the China Club?

9         A        No.

10        Q        Did you ever tell John Centrello

11   that you had arrested someone outside the China

12   Club, and after you had arrested them they showed

13   you a badge from the North Haledon Police

14   Department which had the name Mark Van on it?

15        A        No.

16        Q        Did you ever tell John Centrello

17   that you wanted him to contact the Borough of

18   North Haledon Police Department to advise them of

19   something that happened with a person identifying

20   themselves as Mark Van outside the China Club?

21        A        No.

22        Q        Did you ever tell John Centrello

23   that you called yourself the Borough of North

24   Haledon Police Department to try to tell them

25   about what happened outside the China Club with

**EXHIBIT 35**

1    someone by the name of Mark Van?

2         A         No.

3         Q         Have you ever called the Borough

4    of North Haledon Police Department in your

5    career?

6         A         Not in my life.  If they promise

7    me my hair back I couldn't find it.

8         Q         Do you know an officer by the

9    name of Marc Rowe?

10        A         No.

11        Q         Did you ever hear that name,

12   other than this case?

13        A         No.

14        Q         Did you ever hear the name

15   Officer David Parenta?

16        A         No.

17        Q         Did you ever hear the name

18   Officer Chief Ferrante?

19        A         No.

20        Q         Did you ever tell Officer John

21   Centrello that you lived in New Jersey and you

22   didn't want to get in trouble because you're

23   supposed to live in New York?

24        A         No.

25        Q         Have you ever lived in New Jersey

**EXHIBIT 36**

This Agreement made the ....1...... day of ..Ja..November............................... , 20 04 ....... by

## NORMANDY VILLAGE COMPANY    as Landlord, and

................. James Lanari ............................... as Tenant,

Witnesseth: WHEREAS, on or about ..November 1, 2002.......... the Landlord and the Tenant entered into a written lease for a term commencing .November 1, 2002.......... and ending ............ .ct 31, 2004, covering ...Bld 46 Apt 10...................................... of the Normandy Village Apartments, Nanuet, New York, and the Tenant desires to extend the terms of said Lease.

NOW, THEREFORE said Landlord and Tenant agree that said lease is hereby extended, with all of the terms and conditions to remain in full force and effect during the extension period, except as hereinafter set forth to wit:

1. The term of the lease is hereby extended from ..November 1, 2004..to..October 31, 2006.................

2. During the first year of the extended term of the lease the annual rent is $.12,900.00, payable in equal monthly installments of $ .1,075.00 per month on the first day of each and every month in advance and the security is increased by $ .50.00....... so that the total security in the Landlord's hands is $.2,150.00.

3. During the second year or part thereof (if the extension is for more than one year) the rent charge and the security shall be increased by .5......% or shall be increased to the rental and security amounts being charged by the Landlord at the end of the first year to renters of similar vacant apartments, or which would be charged for the same if they were vacant, whichever is less.

4. It shall be the Tenant's obligation to have illuminated, whenever the Landlord deems it necessary, any hall lights, outside lights, basement lights and crawl space lights which the Landlord has wired to Tenant's own electric meter. Light bulbs will be supplied by the Landlord upon request.

5. Tenant shall pay a $10.00 service charge for each call to inspect, any appliance or individual furnace or hot water heater for the apartment except that there shall be no service charge to inspect or repair water leaks. If the Tenant requests a television service call and the condition was not caused by the master television antenna equipment, the Tenant shall pay the full cost of the service call.

## UPDATED LATE CHARGES:

6. In the event any monthly rent payment is not received by NORMANDY VILLAGE CO. until after the tenth of the month in which it is due but before the twentieth of the month in which it is due, it is understood and agreed that there should be a late charge of $25.00. In the event such payment is not received by the twentieth of the month in which it is due but no later than the next to last working day of the month delivered to the office of NORMANDY VILLAGE CO. there will be a late charge of $50.00. In the event such payment is not received until the last working day of the month in which it is due or later, it is further understood and agreed that there should be a late charge of $100.00.

A 56    Numerous lease comprehensive form, with    PREPARED BY    37/2006    Blumberg Excelsior, Inc., Publisher, NYC 10013
guaranty. plain English format, 11-98    ARNOLD MANDELL, L.L.B.    www.blumberg.com

# LEASE AGREEMENT

**The Landlord and Tenant agree to lease the Apartment for the Term and at the Rent stated on these terms:**

**LANDLORD:** Normandy Village    **TENANT:** James & Brandi Lanari

Address for Notices
24A First Street, Nanuet, New York
10954    521 Normandy Village, Nanuet, New York
10954

Apartment (and terrace, if any)    at
Bank Union State Bank

| Lease date:<br>March 1, 2006 | Term Two-Years<br>**beginning** March 1, 2006<br>**ending** February 28, 2008 | Yearly Rent $23,100.0<br>Monthly Rent $1,925.00<br>Security $3,850.00 |
|---|---|---|
| Broker* 2 Adults | | |

Rider Additional terms on    page(s) initialed at the end by the parties is attached and made a part of this Lease.

**1. Use** The Apartment must be used only as a private Apartment to live in as the primary residence of the Tenant and for no other reason. Only a party signing this Lease may use the Apartment. This is subject to Tenant's rights under the Apartment Sharing Law and to limits on the number of people who may legally occupy an Apartment of this size.

**2. Failure to give possession** Landlord shall not be liable for failure to give Tenant possession of the Apartment on the beginning date of the Term. Rent shall be payable as of the beginning of the Term unless Landlord is unable to give possession. Rent shall then be payable as of the date possession is available. Landlord must give possession within a reasonable time, if not, Tenant may cancel and obtain a refund of money deposited. Landlord will notify Tenant as to the date possession is available. The ending date of the Term will not change.

**3. Rent, added rent** The rent payment for each month must be paid on the first day of that month at Landlord's address. Landlord need not give notice to pay the rent. Rent must be paid in full without deduction. The first month's rent is to be paid when Tenant signs this Lease. Tenant may be required to pay other charges to Landlord under the terms of this Lease. They are called "added rent." This added rent will be billed and is payable as rent, together with the next monthly rent due. If Tenant fails to pay the added rent on time, Landlord shall have the same rights against Tenant as if Tenant failed to pay rent.

**4. Notices** Any bill, statement or notice must be in writing. If to Tenant, it must be delivered or mailed to the Tenant at the Apartment. If to Landlord it must be mailed to Landlord's address. It will be considered delivered on the day mailed or if not mailed, when left at the proper address. A notice must be sent by certified mail. Each party must accept and claim the notice given by the other. Landlord must notify Tenant if Landlord's address is changed.

**5. Security** Tenant has given security to Landlord in the amount stated above. The security has been deposited in the Bank named above and delivery of this Lease is notice of the deposit. If the Bank is not named, Landlord will notify Tenant of the Bank's name and address in which the security is deposited.

If Tenant does not pay rent or added rent on time, Landlord may use the security to pay for rent and added rent then due. If Tenant fails to timely perform any other term in this Lease, Landlord may use the security for payment of money Landlord may spend, or damages Landlord suffers because of Tenant's

Landlord is allowed to keep for expenses. Landlord need give Tenant interest on the security if Tenant is in default.

**6. Services** Landlord will supply: (a) heat as required by (b) hot and cold water for bathroom and kitchen sink, (c) use elevator, if any, and (d) cooling if central air conditioning installed. Landlord is not required to install air-condition Stopping or reducing of service(s) will not be reason for Ten to stop paying rent, to make a money claim or to claim evicti Tenant may enforce its rights under the warranty of hab ability. Damage to the equipment or appliances supplied Landlord, caused by Tenant's act or neglect, may be repai by Landlord at Tenant's expense. The repair cost will be ad rent.

Tenant must pay for all electric, gas, telephone and o utility services used in the Apartment and arrange for th with the public utility company. Tenant must not use dishwasher, washing machine, dryer, freezer, heater, ventila air cooling equipment or other appliance unless installed Landlord or with Landlord's written consent. Tenant must use more electric than the wiring or feeders to the Building safely carry.

Landlord may stop service of the plumbing, heating, ele tor, air cooling or electrical systems, because of accid emergency, repairs, or changes until the work is complete.

If Landlord wants to change a person operated elevator to automatic elevator, Landlord may stop service on 10 da notice. Landlord will then have a reasonable time to be installation of an automatic type elevator.

**7. Alteration** Tenant must obtain Landlord's prior wri consent to install any panelling, flooring, "built in" decorati partitions, railings, or make alterations or to paint or wallpa the Apartment. Tenant must not change the plumbing, ven ting, air conditioning, electric or heating systems. If consen given, the alterations and installations shall become property of Landlord when completed and paid for. They s remain with and as part of the Apartment at the end of Term. Landlord has the right to demand that Tenant rem the alterations and installations before the end of the Te The demand shall be by notice, given at least 15 days before end of the Term. Tenant shall comply with the demand Tenant's own cost. Landlord is not required to do or pay any work unless stated in this Lease.

If a lien is filed on the Apartment or Building for any reas relating to Tenant's fault, Tenant must immediately pay bond the amount stated in the Lien. Landlord may pay or b

**EXHIBIT 37**

1    Q      You have to say yes.

2    A      Yes, I'm sorry.

3    Q      A couple of days afterwards, as I

4  understand it, you had another conversation with

5  John Centrello?

6    A      You're right, approximately two

7  to three, maybe a week later, yeah.

8    Q      And at that point in time

9  Centrello said to you what?

10    A      That some detectives from North

11  Haledon wanted to come to my job to talk to me

12  about what happened at the China Club.

13    Q      And your response to him was

14  what?

15    A      What happened at the China Club?

16  I mean, you know.  Oh, he said, the thing with

17  Mark Van.  I said, John, that never happened, you

18  got this whole thing wrong.

19         I said, either you take care of

20  it or I will, but you got to straighten it out.

21  Then he left and I left.

22    Q      Did you tell him he had a

23  misunderstanding as to what you said?

24    A      I don't believe I said the exact

25  words you misunderstood.  I think maybe I said

**EXHIBIT 38**

1    of Mark Rowe's, and he said I know your friendly with

2    the guys from North Haledon, you might want to relay

3    this to them.  This is what Mark Rowe told me.  We had

4    a guy named Mark Van who works for North Haledon.  He

5    was involved in an altercation, he let him go, maybe

6    you want to alert those guys or talk to Mark Van.

7         Q.        When this information comes to you to

8    claim someone was using a police badge that has a name

9    Mark Van on it and a police ID card, what's your level

10   of concern at that point?

11   A.        I want the badge and the identification back.

12        Q.        Are you concerned there could be

13   someone out there improperly using a police badge?

14   A.        Absolutely.

15        Q.        Would you agree with me that if

16   someone is improperly using a police badge, even Mark

17   Van, it constitute a criminal act; does it not?

18   A.        Would I agree with that, yes.

19        Q.        This is why you, I take it, were

20   concerned enough where you said I want to get reports

21   from whoever reported this to you, Sergeant Rowe?

22   A.        That's correct.

23        Q.        Sergeant Rowe says to you these guys

24   can't do that.  They are not going to give up -- he

25   doesn't want to give a report.  Why did you accept

**EXHIBIT 39**

1  begin with?

2  A.      To begin a full investigation.

3         Q.      When people don't cooperate with an

4  investigation, is that appropriate?

5  A.      I don't -- if you get a written report, that's

6  the rational to begin an investigation.  If you don't

7  get a written report, that's hearsay.  I don't begin

8  investigations on hearsay.

9         Q.      Chief, I'm really trying to understand

10  this.  Let's say Fort Lee Police calls you up.  You're

11  the Chief, and they say, listen, a cop in your town

12  beat someone up last night in a Fort Lee bar and he

13  had his uniform on and he was drunk out of his mind.

14  You say to that officer, well, Officer, I want a

15  written report from you.  That officer said no, I'm

16  not giving you a written report.  Do you think that

17  would be appropriate?

18  A.      Do I think it would be?

19         Q.      Yes?

20  A.      No, I would contact the Fort Lee Chief and

21  tell him what they had said and if they still refused

22  to give me a report, then I wouldn't do anything.  I

23  wouldn't have a choice.

24         Q.      So why did you --

25  A.      I might -- can I finish?

**EXHIBIT 40**

1     report that he contacted a guy by the same of John

2     Centrillo from the Dumont Police Department?

3     A.     Now I do recall reading that report. I got

4     that from the attorney last week or a few days ago.

5         Q.     I don't want to talk about last week

6     or a few days ago. I'm telling you that Detective

7     Parenta has indicated in a report in testimony before

8     he went up to Harrington Park, okay, he went and spoke

9     to a guy named John Centrillo, who supposedly has the

10    friend in New York, and he said to tell me who the guy

11    is in New York, and he says I won't tell you that.

12    Did Parenta ever communicate to you that someone

13    refused to give him the identification of the New York

14    Officer, did Parenta ever tell you that?

15    A.     Detective Parenta completed a report after he

16    spoke to Mark Van and Lieutenant Darby. He may have

17    mentioned the name in that report.

18        Q.     Before the report, before he spoke to

19    Mark Van?

20    A.     I don't recall that name, no.

21    The first time I heard that name was a few days ago

22    when I spoke to my attorney or I read it in a report

23    somewhere.

24        Q.     So, is it fair to say Detective

25    Parenta was the one that you appointed to conduct this

**EXHIBIT 41**

1    the information?

2    A.        Honestly, I didn't really press him because it

3    was a courtesy.  This is common for police departments

4    to get courtesies like this.

5             Q.        You never do it -- in your career,

6    have you ever had a situation before where someone is

7    accused, a former police officer, in a department

8    that you worked in, of using a police badge that

9    didn't belong to them anymore.

10            Have you ever heard that accusation before

11   this time?

12   A.        I'm not certain about a police badge.  I don't

13   think I was the Chief.  I can recall two instances

14   since I'm on the department.  One more than likely as

15   the Acting Chief, and the other as just an officer on

16   the department.  Someone up in Sussex County there was

17   an altercation at a party, a Halloween Party, I

18   believe, and someone there when the police arrived was

19   dressed in a North Haledon uniform with a North

20   Haledon badge.  The clothing was taken by the police

21   department and we just went up to pick it up and they

22   found out that somehow they got the clothing and the

23   badge from a former officer who worked in our

24   department.  And in those days they kept all of that.

25            And the second incident was when I was either

**EXHIBIT 42**

2 (Pages 5 to 8)

**5**

1　　Q.　Do you have any questions for me before we
2　start today?
3　　A.　No, sir, I don't think so.
4　　Q.　Are you on any medications or drugs that
5　would prevent you from telling the truth today?
6　　A.　No.
7　　　(Kirkham Exhibit 1, Dr. Kirkham's
8　　　professional vita, was marked for identification.)
9　BY MR. RAINONE:
10　　Q.　I am going to show you what we have marked
11　as Kirkham I which for the record is a copy of your
12　professional vita dated October 2007 which I received
13　from Mr. Faugno and I also printed up a copy from the
14　website that you maintain. Have you seen that document
15　before?
16　　A.　Yes, I have.
17　　Q.　And is my characterization of it correct?
18　　A.　Yes, it is correct.
19　　Q.　Okay. Who prepared that document?
20　　A.　I did.
21　　Q.　When did you prepare it?
22　　A.　Well, initially quite some years ago and I
23　just update it each year.
24　　Q.　Okay. When was the most recent update?
25　　A.　The most recent update would have been just

**6**

1　prior to October of '07.
2　　Q.　Okay. And are all the statement in that
3　CV -- I'm going to call it a CV for the record.
4　　A.　Sure.
5　　Q.　Are all the statements in that CV 100
6　percent true?
7　　A.　Yes, to the best of my -- some things are
8　estimates on numbers of cases and things like that, but
9　as accurately as I can render it, yes.
10　　Q.　Okay. Are there any overstatements in the
11　CV?
12　　A.　No, I don't think so.
13　　Q.　Are there any half truths or three quarter
14　truths in the CV?
15　　A.　No.
16　　Q.　Yes or no, you haven't published an article
17　since 1989, correct?
18　　A.　That's correct. I have a book coming out
19　in the spring, spring to summer, but no, I have not.
20　　Q.　What is the name of the book you have
21　coming out?
22　　A.　Ivory Tower Cop.
23　　Q.　And was that a book that had previously
24　been published?
25　　A.　No, it is based on my autobiography which

**7**

1　was published some years ago. It is a novel based on
2　my autobiography that contains a lot of police
3　procedural information.
4　　Q.　Does the Ivory Tower book address standards
5　for police investigations?
6　　A.　Well, by way of a thorough answer, it's
7　about police investigation in a particular type of
8　crime. And so while it contains nothing that bears
9　directly on the case at bar here, it does contain a
10　great deal about criminal investigation and police
11　investigative procedures, forensics and so on.
12　　Q.　When did you write that book?
13　　A.　I have been working on it with a colleague
14　for some years now, particularly the last four or five
15　years.
16　　Q.　When is it going to be published?
17　　A.　It should be out in the spring or the
18　summer.
19　　Q.　And other than that book, you have not
20　published any other material since 1989; is that
21　correct?
22　　A.　Well, I had a body language training
23　series. I'm trying to remember. It will show on the
24　vita when that came out. That may have been somewhere
25　around '90, '89, '90. I'm not sure. Probably is the

**8**

1　last thing.
2　　Q.　Okay. According to your CV, you got a
3　doctorate degree in 1971 and you became a police
4　officer in 1973; is that accurate?
5　　A.　Initially a police officer in '73, yes.
6　　Q.　And you were a patrolman?
7　　A.　Patrolman in Jacksonville, yes.
8　　Q.　What did you do for the two year period
9　between 1971 and 1973?
10　　A.　Well, I was employed as a full-time
11　assistant professor of criminology at Florida State
12　University.
13　　Q.　Before you had a doctorate or after you had
14　a doctorate?
15　　A.　No, after I got my doctorate. Between '71
16　and '73 I took a leave, I went to police academy and
17　then went to work in Jacksonville for six months and
18　came back to the university.
19　　Q.　So from 1971 to 1973 you taught criminology
20　at Florida State University?
21　　A.　Yes. Indeed I did for the following 20
22　years, until 1991.
23　　Q.　And in your CV it says that you walked the
24　beat in a major American city. What city was that?
25　　A.　Jacksonville, Florida.